JOHN G. DANIELSON, INC., Plaintiff,

v.

WINCHESTER–CONANT PROPER-
TIES, INC. and the Willows at Win-
chester, LLC, Defendants.

No. Civ.A.00–11021–WGY.

United States District Court,
D. Massachusetts.

Feb. 27, 2002.

Anthony E. Battelle, Brookline, MA, for plaintiff.

Judith Ashton, Davis, Malm & D'Agostine, P.C., Boston, MA, for defendants.

*MEMORANDUM*

YOUNG, Chief Judge.

John G. Danielson, Inc. ("Danielson"), an architectural firm located in Lexington,

Massachusetts, brings this action against Winchester–Conant Properties, Inc. ("Winchester–Conant") and The Willows at Winchester, LLC ("Willows LLC") (collectively "Winchester–Willows"), for copyright infringement under the Copyright Act, 17 U.S.C. § 101 *et seq.* (Count I), conversion (Count II), false designation or description of origin under the Lanham Act, 15 U.S.C. § 1125(a) (Count III), and unfair and deceptive trade practices under Chapter 93A of the Massachusetts General Laws (Count IV). Danielson's claims arise out of Winchester–Willows's alleged use, without Danielson's permission, of architectural plans drafted by or under the supervision of Danielson for a condominium project called the Willows at Winchester in Winchester, Massachusetts. Winchester–Willows moved for summary judgment on all counts. Danielson cross-moved for partial summary judgment on the copyright infringement, false designation or description of origin, and 93A claims. (Danielson would leave for trial the conversion claim and the issue of damages.)

On November 14, 2001, the parties argued these motions for summary judgment, and the Court took the motions under advisement. On February 8, 2002, in the interest of allowing the parties adequately to prepare for trial, the Court announced its conclusions of law:

1. Architectural drawings are amenable to copyright protection under the law as it existed at the time the drawings at issue in this case were created.

2. The particular architectural drawings at issue here are sufficiently original to warrant copyright protection.

3. Danielson has standing to pursue this case as the owner of the copyright interests embedded in the drawings. The June 29, 1987 contract between Danielson and Tellalian Associates ("Tellalian") effected a transfer of copyright from the author of the drawings, Tellalian, to Danielson. Such a transfer satisfies the statute of frauds provision of 17 U.S.C. § 204. Even if it did not, the absence of a dispute between Tellalian and Danielson as to Danielson's ownership of the copyright interests in the drawings bars Winchester–Willows from attacking the validity of the transfer.

4. There is no genuine dispute as to the fact that Winchester–Willows infringed Danielson's copyright. Winchester–Willows do not deny that they had access to the drawings at issue here. A comparison of the copyrighted drawings with the allegedly infringing drawings shows that no reasonable trier of fact could find other than that the allegedly infringing drawings are substantially similar to the copyrighted drawings.

5. The fact that Medford Engineering ("Medford"), and not Winchester–Willows, did the actual copying of the copyrighted drawings does not excuse Winchester–Willows from liability for infringement.

6. As matter of law, Danielson did not publish the drawings at issue here.

7. As matter of law, Danielson did not grant an implied nonexclusive license to Winchester–Willows.

8. The doctrine of merger does not apply to this case.

9. As matter of law, Danielson did not abandon its copyright interests in the drawings at issue here.

10. A genuine issue of material fact remains as to whether Danielson knew, or in the exercise of reasonable diligence should have known,

that Winchester–Willows infringed its copyright more than three years before it lodged its complaint with this Court. If Danielson should have known that Winchester–Willows infringed its copyright more than three years before filing suit, the copyright claim is barred by the three-year statute of limitations for copyright infringement claims under the Copyright Act, 17 U.S.C. § 507(b).

11. If Danielson's claim is not barred by the statute of limitations, Danielson may proceed to prove damages, including actual damages and any profits reaped by Winchester–Willows attributable to the infringement. Under 17 U.S.C. § 504(b), as to profits, Danielson need only show gross profits gained by Winchester–Willows from the project. Winchester–Willows may then show deductible expenses, as well as elements of profit attributable to factors other than the copyrighted work.

12. Danielson's conversion claim is not preempted by the Copyright Act. Danielson may attempt to show at trial that it suffered harm as a result of Winchester–Willows's wrongful physical possession of the drawings at issue here.

13. Danielson's Chapter 93A claim is preempted by the Copyright Act.

14. Danielson's Lanham Act claim survives summary judgment.

Order of Feb. 8, 2002 [Docket No. 56].

Taking the issues in slightly different order, this Memorandum explains the reasons for the Court's judgment. The Court begins with an exposition of those facts that are critical to the resolution of these motions.

# I. Background

On June 29, 1987, Danielson executed a contract with Louis Farese ("Farese"), trustee of Conant Road Realty Trust ("Conant Realty Trust"), to perform architectural services for a proposed residential development comprising 70 condominium units called "The Willows at Winchester" (the "Project") located at 228 Cross Street and 7 Conant Road in Winchester, Massachusetts (the "Property"). Edmond Danielson Aff. ¶ 3–4 [Docket No. 27]. At the time, Conant Realty Trust owned the Property on which the Project was to be built. *Id.* ¶ 4. By the time the contract between Farese and Danielson was executed, Danielson had already completed seven drawings for the Project. *Id.* ¶¶ 6–7. These drawings were to be submitted to the Town of Winchester ("Town") Planning Board and Board of Appeals so that Conant Realty Trust could obtain a zoning variance permitting it to construct residential units in an area zoned for industrial use, and so that it could obtain a special permit to build the Project. These seven drawings became known as the "Covenant Drawings." Four of the Covenant Drawings, labeled SP–1, SP–2, SP–3, and A–3, are at issue in this litigation. *Id.* ¶ 7 & Exs. B (drawing SP–1), C (drawing SP–2), D (drawing SP–3), E (drawing A–3). Danielson concedes that three of the seven original drawings, labeled A–1, A–2, and EX–1, are not at issue in this litigation. *Id.* ¶ 7. Three of the Covenant Drawings at issue, SP–1, SP–2, and SP–3, bear Danielson's logo, as well as the logo of Tellalian Associates, Architects. & Planners ("Tellalian"), a firm that assisted Danielson in the preparation of the design documents. *Id.* ¶ 8. The fourth drawing at issue, A–3, does not bear the logo of. Danielson or Tellalian Associates, *id.*, but instead appears to have been authored by Peter Whitman, an independent contractor who worked with Danielson and Tellalian, Defs.' Opp'n ¶ 2

[Docket No. 31]. None of the Covenant Drawings bears a notice of copyright. Defs.' Facts ¶ 4 [Docket No. 21].

The contract between Danielson and Farese is a 1977 version of a standard form American Institute of Architects ("AIA") agreement between the owner, Conant Realty Trust, and the architect, Danielson. Several of its provisions are relevant here. The contract provides that Danielson "shall prepare, for approval by the Owner, Schematic Design Documents consisting of drawings and other documents illustrating the scale and relationship of Project components." Edmond Danielson Aff.Ex. A, art. 1.1.4. Danielson was contractually required to follow up these schematic drawings with more detailed design development drawings, id. art. 1.2.1, and then construction documents, id. art. 1.3.1. Danielson was also required to assist Conant Realty Trust in filing such documents with the relevant government agencies, id. arts. 1.3.4 & 15, and was to supervise construction of the project, id. art. 1.5.

The contract also provided that Danielson owned the drawings and specifications rendered in connection with the project, id. art. 8.1. While Conant Realty Trust was entitled to retain copies of the drawings, the contract provided that "[t]he Drawings and Specifications shall not be used by the Owner on other projects, for additions to this Project, or for completion of this Project by others provided the Architect is not in default under this Agreement, except by agreement in writing and with appropriate compensation to the Architect." Id. The contract also stated that "[s]ubmission or distribution to meet official regulatory requirements or for other purposes in connection with the Project is not to be construed as publication in derogation of the Architect's rights." Id. art. 8.2.

Conant Realty Trust submitted the Covenant Drawings to the Town Planning Board for permission to construct the residential development sometime in June 1987. Edmond Danielson Aff. ¶ 13. On November 4, 1987, the Town Board of Appeals granted a special permit to construct the development in accordance with a Restrictive Covenant (the "Restrictive Covenant") that was subsequently executed by Conant Realty Trust and the Town Planning Board. Id.; Defs.' Facts ¶ 8. Among other things, the Restrictive Covenant provided that it was to run with the property as binding on all successors in interest for 30 years, Edmond Danielson Aff.Ex. J, §§ IV.B, IV.C, that construction was to proceed "substantially as shown on the Project Plans," id. § IV.E, with "Project Plans" defined to mean the original Covenant Drawings, id. § I & Ex. B, that any modification of the Project Plans was to be submitted to the Town Building Inspector for approval, id. § IV.F, and that the Covenant could not be amended except by a two-thirds vote of a Town Meeting, id. § IV.J.

In 1987 and 1988, Danielson prepared a more elaborate set of drawings for the proposed development; this set comprised 87 drawings in all. Edmond Danielson Aff. ¶¶ 15–16. These drawings, separate from the Covenant Drawings, became known as the "Project Drawings." Four of the 87 Project Drawings, labeled C–1, C–3, C–4, and L–1, are at issue in this litigation. Id. ¶ 17 & Exs. K (drawing C–1), L (drawing C–3), M (drawing C–4), N (drawing L–1). These drawings all bear the logos of Danielson and Tellalian Associates; two of the drawings (C–3 and C–4) also bear the logo of Medford Engineering ("Medford"), another of Danielson's subconsultants during the project, id. Exs. L, M. As with the Covenant Drawings, none of the Project Drawings bears a copyright notice. Defs.' Facts ¶ 29. Those of the

Covenant Drawings and Project Drawings that are at issue in this litigation have become known as the "Claim Drawings."

With the exception of Covenant Drawing A–3, all of the Claim Drawings are roughly similar to one another. They depict, with varying degrees of detail, the footprints, configuration and location of five buildings that were to be built on the Property, as well as the location of parking, pedestrian walkways, and open spaces. Covenant Drawing A–3, in contrast, is a three-dimensional perspective drawing of what some of the condominiums were to look like.

By mid–1988, Conant Realty Trust encountered financial difficulties, and was unable to complete payment to Danielson for services rendered. Danielson's outstanding invoices in 1988 totaled $226,243.04. Edmond Danielson Aff.Ex. O. Danielson was never reimbursed for that outstanding balance. Consequently, the project was abandoned for several years.

In 1994, Winchester–Conant purchased the Property on which the original Project was to be carried out, and acquired the Claim Drawings. Defs.' Facts ¶ 18; Edmond Danielson Aff. ¶ 23. In April 1994, Winchester–Willows approached Edmond Danielson, principal of Danielson, to discuss possibilities to develop the Property. Defs.' Facts ¶ 19; Edmond Danielson Aff. ¶ 24. Edmond Danielson said he would be interested. Edmond Danielson Aff. ¶ 24; Defs.' Facts ¶ 19. Danielson accordingly created a new plan for developing the property into 80 apartment units intended for elderly residents. Edmond Danielson Aff. ¶ 25. Winchester–Willows rejected Danielson's new plan, however, and the parties had no further contact for several years. Id.; Defs.' Facts ¶ 21.

In 1995, Winchester–Willows attempted to obtain Town approval for alternative plans to develop the property, but were unsuccessful. Defs.' Facts ¶ 22. The stat-ed reason for the Town's rejection of Winchester–Willows's alternative proposals was that such proposals were not in conformity with the plans incorporated by reference into the Restrictive Covenant—the Covenant Drawings. Edmond Danielson Aff. Ex. S (Minutes of the Town Planning Board, dated July 31, 1995, rejecting Winchester–Conant's proposals to develop the Property on the ground that it had rejected such proposals at the previous two meetings, because "[a]ny development on this property must be in accordance with the existing Covenant endorsed by the Planning Board on February 8, 1988"). Sometime in 1995, then, Winchester–Willows abandoned its plan to proceed with an alternative design, and decided to build in accordance with the Restrictive Covenant. Defs.' Facts ¶ 22. That same year, Winchester–Willows applied to the Town Planning Board for permission to build on the Property using plans that conformed to the Covenant Drawings.

On December 18, 1995, the Town Board of Appeals granted Winchester–Willows permission to begin building the new project on the condition that construction take place "in conformity with the . . . plans . . . submitted to the Board." Edmond Danielson Aff. Ex. Y, at 3 (decision of Town Board of Appeals granting Winchester–Conant's request for a special permit). The "plans" submitted to the Board were described as follows:

Building Location Plan by Medford Engineering & Survey . . . dated October 5, 1987, revised through July 11, 1995(C–1); Grading Plan by Medford Engineering, dated October 13, 1987, revised through July 11, 1995(C–3);

Utility Plan by Medford Engineering, dated December 1, 1987, revised through July 11, 1995(C–4);

. . . .

Site Landscape Plan, dated July 13, 1995, revised through September 7, 1995 by Meehan Architects (L–1).

*Id.* at 3–4.

Danielson alleges that Winchester–Willows, with assistance from Medford (which worked on both the original Project and Winchester–Willows's project), took Danielson's Project Drawings C–1, C–3, C–4, and L–1, removed the logos of Danielson and Tellalian by erasing them or cutting them out, and presented these drawings to the Town as property of Medford and Winchester–Willows. Edmond Danielson Aff. ¶ 31. Winchester–Willows acknowledge that "Medford made changes to the Claim Drawings when it performed work for Conant" and that "Meford cut out the Danielson and Tellalian logos from several of the Claim Drawings," but insist that they were "not aware that Medford cut them out." Def.'s Opp'n ¶ 9. Winchester–Willows do not deny, however, that they used the drawings altered by Medford in applying for Town approval to resuscitate the Project.

According to Danielson, the next contact between Danielson and Winchester–Willows came in August 1997, when an associate architect of Danielson who had been the lead architect on the 1987–88 project, George Elanjian, drove by the property and observed a sign advertising "The Willows at Winchester," Edmond Danielson Aff.Exs. P, Q, that closely resembled Covenant Drawing A–3, *id.* Ex. E. This led Elanjian to drive onto the property and obtain from the on-site construction office a brochure of the current development project. The brochure contained a layout design that appeared closely to match the layout design originally conceived in 1987–88 by Danielson. After raising its concerns with Winchester–Willows and attempting unsuccessfully to resolve the dispute short of litigation, Danielson filed suit in this Court on May 23, 2000.

On September 30, 2001, Winchester–Willows filed their motion for summary judgment. In that motion, they contend that even if they copied work that belonged to Danielson, Danielson is not entitled to copyright protection because: (a) Danielson published the Covenant and Project Drawings throughout the process of applying for the special permit in 1987; (b) Danielson granted an implied license to copy the work through its conduct in making the drawings widely available to subcontractors, Town planning officials, and members of the community; (c) the ideas at issue here are susceptible of only one form of expression due to the Restrictive Covenant, and thus are not protected by copyright law under the doctrine of merger; and (d) Danielson has abandoned any entitlement to copyright protection. As to Danielson's state law claims, Winchester–Willows argue that they are preempted by the Copyright Act, which provides the underlying basis for recovery on either of the state law claims. Winchester–Willows also assert that the three-year statute of limitations for copyright infringement has expired, and that Danielson should be barred from bringing suit under the equitable doctrine of laches. Finally, Winchester–Willows assert that Danielson has no standing to sue, because Tellalian, and not Danielson, owns the copyrights to the disputed drawings because Tellalian created the drawings. In short, Winchester–Willows do not deny that they possessed and used Danielson's drawings in obtaining permission to build the Willows at Winchester condominium development, *e.g.,* Summ.J. Hr'g Tr. at 8–9 [Docket No. 44], but instead interpose a number of defenses that impugn the validity of Danielson's copyright interests in the Claim Drawings.

Danielson responds with a summary judgment motion of its own, in which it contends that every claim except conversion may be adjudicated on summary judg-

ment in favor of Danielson. Danielson also asserts that the issue of damages should be left for trial, as the parties disagree over the portion of the $19,500,000 in gross receipts obtained by Winchester–Willows from the sale of the condominium units built on the Property, Edmond Danielson Aff. ¶ 47 & Ex. FF, that should be awarded to Danielson in the event Winchester–Willows are found liable. According to Danielson, more factual development is necessary in order to resolve this issue.

## II. Discussion

Most of the facts outlined above and discussed below are not in dispute. As to those facts that are disputed, because all parties have moved for summary judgment, the Court will isolate those facts that provide the basis for any particular argument in support of summary judgment, place the gloss most favorable to the nonmoving party on those facts, and determine whether the dispute with respect to that argument is genuine. Fed.R.Civ.P. 56(c). A dispute is genuine only if a reasonable factfinder might find for the nonmoving party given the facts in the light most favorable to the nonmovant. *E.g.*, *Navarro v. Pfizer Corp.*, 261 F.3d 90, 93–94 (1st Cir.2001).

The parties sensibly devote most of their time and energy to debating the merits of Danielson's claim for copyright infringement. The Court will do the same. The Court will then discuss, briefly, Danielson's Lanham Act claim, as well as its state law claims.

### A. Copyright Infringement

The elements of a claim of copyright infringement are simple and familiar. The plaintiff in a copyright infringement action must show "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,

499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991); *accord Segrets, Inc. v. Gillman Knitwear Co.*, 207 F.3d 56, 60 (1st Cir.2000). To prevail at summary judgment on an infringement claim, the plaintiff must show that no reasonable trier of fact could find other than that these elements have been met, a difficult but not impossible task. *See Segrets*, 207 F.3d at 62 (noting that summary judgment for the plaintiff in an infringement action is "unusual," but affirming the district court's grant of summary judgment on infringement). The Court asks first whether Danielson owned a valid copyright in the Claim Drawings, which the Court answers with separate discussions of whether the Claim Drawings are copyrightable and, if so, whether Danielson owned the copyright interests to the Drawings. The court then considers whether Winchester–Willows copied any of Danielson's copyrightable work.

### 1. Architectural Plans and Copyright Protection

The parties do not genuinely dispute that the architectural drawings at issue in this case are subject to copyright protection. Although the Copyright Act of 1976 (the "Act"), which governed Danielson's rights at the time the Claim Drawings were created, did not explicitly protect architectural drawings, courts have understood the Act to protect such drawings under the Act's protection of "pictorial, graphic and sculptural works," 17 U.S.C. § 102(a)(5) (1982), which was defined to include "technical drawings, diagrams, and models," *id.* § 101. *E.g., Robert R. Jones Assocs., Inc. v. Nino Homes*, 858 F.2d 274, 278 (6th Cir.1988). This interpretation was consistent with, and followed from, clear congressional intent that such architectural plans be protected by the Act. *E.g.*, H.R.Rep. No. 94–1476, at 55 (1976) ("An architect's plans and drawings

would, of course, be protected by copyright...."), *reprinted in* 8 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* app. 4, at 20 (2001). In 1988, the Act was amended expressly to include within its ambit architectural plans. Berne Convention Implementation Act of 1988, Pub.L. No. 100–568, § 4(a)(1)(A), 102 Stat. 2853, 2854. This amendment was understood by Congress merely to codify the pre-existing protection afforded to architectural plans. *E.g.,* S.Rep. No. 100–352, at 8, 39 (1988), *reprinted in* 9 Nimmer & Nimmer, *supra,* app. 35, at 11, 55. At all times relevant to this dispute, therefore, the drawings at issue here were amenable to copyright protection.

■ Winchester–Willows argue that the particular drawings at issue here are insufficiently original to warrant copyright protection. Defs.' Opp'n at 6–7. Winchester–Willows wisely devote most of their time and paper to other arguments, given the low threshold of originality required to establish copyrightable work. As the Supreme Court observed in *Feist:*

> [T]he requisite level of creativity [for copyright protection] is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be. Originality does not signify novelty; a work may be original even though it closely resembles other works so long as the similarity is fortuitous, not the result of copying.

499 U.S. at 345, 111 S.Ct. 1282 (citation and internal quotation marks omitted). Winchester–Willows's brief assault on the originality of Danielson's drawings targets individual elements of the plans—the rectangular clubhouse, the crescent shape of two of the buildings, the placement of pathways—but ignores the gestalt of Danielson's work. Even if any of these elements alone is not subject to copyright

protection, Danielson's choices regarding the shape, arrangement, and location of the buildings, the design of the open space, the location of parking and sidewalks, as well as Danielson's combination of these individual design elements, amounted to a unique approach to converting the Property into a livable space that meets the low threshold of originality required under *Feist. See generally* Edmond Danielson Aff.Exs. B–D, K–N (depicting Claim Drawings SP–1, SP–2, SP–3, C–1, C–3, C–4, and L–1, respectively). No reasonable trier of fact, properly instructed in the law on this point, could find otherwise. The Claim Drawings are sufficiently original as matter of law to warrant protection under the Act.

**2. Ownership of Copyright Interests—Standing**

■ The originality of the Claim Drawings is of no use to Danielson, however, if Danielson does not own the copyright interests embedded within them, as Winchester–Willows suggest. According to Winchester–Willows, Tellalian, not Danielson, authored the drawings at issue here. Because the author of a work is considered the owner of any copyright attached to the work, and because only the owner of a copyright may sue to seek redress for infringement of the copyright, Winchester–Willows contend that Danielson lacks standing to litigate this case. Defs.' Mem. at 14–15 [Docket No. 20]. Winchester–Willows acknowledge that an author legally may transfer copyrights in a work to another party, but contend that no such transfer took place in this case. *Id.*

The Act provides that only the "legal or beneficial owner" of a copyright is entitled to sue when the copyright is infringed. 17 U.S.C. § 501(b). Legal ownership of copyright in a work "vests initially in the author or authors of the work." *Id.* § 201(a). Danielson concedes that Tellalian, the ar-

chitectural "subconsultant," was the entity that "physically put pen to paper" to create the drawings, Pl.'s Mem. at 16 [Docket No. 26], which means that Tellalian is the author of the plans, and the entity in which copyright initially vested.

An author of a work subject to copyright protection may, however, transfer copyright held in the work. *Id.* § 201(d)(1). Such a transfer must be effectuated by operation of law,[1] or in writing through an instrument of conveyance or a note or memorandum of transfer. *Id.* § 204(a). At issue in this case is whether Tellalian executed a written instrument of conveyance or a note or memorandum of transfer of copyright to Danielson that would make Danielson the legal owner of the copyright interests embedded within the Claim Drawings.

In a contract dated June 29, 1987, and signed by Donald Tellalian, Danielson and Tellalian agreed that "the Work, Drawings, and Specifications prepared by [Tellalian] as instruments of service are and shall be the property of [Danielson]." Edmond Danielson Aff. Ex. F, art. 8.1. The contract further provides that "[s]ubmission or distribution to meet official regulatory requirements ... is not to be construed as publication in derogation of [Danielson's] or [Tellalian's] rights." *Id.* art. 8.2.

To determine whether this contract suffices as an instrument of conveyance of Tellalian's copyright interests in the drawings at issue here, the Court reads the contract provisions recited above using the following principles of copyright law and contract construction. First, transfer of ownership of the material object protected by copyright law—in this case, the Claim Drawings—does not, by itself, amount to transfer of copyright ownership. 17 U.S.C. § 202. Second, "even though a written instrument may lack the terms 'transfer' and 'copyright,' it still may suffice to evidence [the author's and the transferee's] mutual intent to transfer the copyright interest." 3 Nimmer & Nimmer, *supra,* § 10.03[A][2]. Third, "in construing a written agreement, courts must consider every phrase and clause in light of all the others in the instrument, 'which must be considered as a workable and harmonious means for carrying out and effectuating the intent of the parties.'" *SAPC, Inc. v. Lotus Dev. Corp.,* 921 F.2d 360, 363 (1st Cir.1990) (quoting *J.A. Sullivan Corp. v. Commonwealth,* 397 Mass. 789, 795, 494 N.E.2d 374 (1986)).

Here, the agreement between Danielson and Tellalian does not explicitly mention the word copyright. It does, however, state unequivocally that Danielson owns the drawings that are the subject of the agreement and that Tellalian is merely entitled to retain copies of the drawings and to reproduce them for the purpose of working on the project. Edmond Danielson Aff.Ex. F, art. 8.1. Were this all the contract said, it might not be enough to effectuate a transfer of copyright. Article 8.2 of the agreement, however, mentions submission of documents to regulatory authorities, stating that such submission shall not amount to "publication in derogation of [Danielson's] rights," *id.* art. 8.2, language borrowed from copyright-speak. *See, e.g., infra* Part II.A.4.a (discussing publication). These two provisions, which are the only portions of the integrated agreement between the parties that address ownership and use of the drawings,

---

1. Danielson does not argue that copyright in the drawings at issue here was transferred from Tellalian to Danielson "by operation of law" under 17 U.S.C. § 204(a). While this term is not defined in the statute, it is understood to comprise transfers pursuant to "disposition by courts in bankruptcy, probate, and the like." 3 Nimmer & Nimmer, *supra,* § 10.03[A][6].

suggest that the parties intended that Danielson own not only the physical documents, but also any copyright interests embodied in the documents. While the provisions are not completely free from ambiguity (Danielson would be well advised to place the word "copyright" in future agreements of this kind to reduce such ambiguity), the combination of the sweeping language of ownership granted to Danielson along with the reference to publication suggests that Danielson became the owner not only of the physical plans, but also of the copyrights embedded within them as a result of the June 29, 1987 contract between Danielson and Tellalian.

Winchester–Willows downplay the importance of the original agreement between Danielson and Tellalian by arguing that because the original Covenant Drawings were completed before the execution of the agreement between Danielson and Tellalian, the agreement does not cover those Drawings. Def.'s Mem. at 14–15. The Court finds this argument unpersuasive. Article 1 of the agreement between Danielson and Tellalian provides that Tellalian was required to provide "Schematic Design, Design Development, and Construction Documents" to Danielson, which Danielson was to provide to Conant Realty Trust. Edmond Danielson Aff.Ex. F, art. 1.1. These three phases of construction outlined in the Danielson–Tellalian agreement exactly correspond with three of the phases of construction Danielson was obligated to supervise under its agreement with Conant Realty Trust. The Covenant Drawings were the first set of drawings to be completed by Tellalian for Danielson in order that Danielson might satisfy the first phase of its obligation to Conant Realty Trust. These Drawings later were to be enhanced in the form of more detailed "Project Drawings," and construction plans at the last stage.

The Danielson–Tellalian agreement, particularly when viewed in light of Danielson's contractual obligations to Conant Realty Trust, which the Danielson–Tellalian agreement was executed to help effectuate, suggests that the Covenant Drawings, even though created a few days before the Danielson–Tellalian agreement was executed, were part of the first stage of a relationship that was to be governed by the agreement. Winchester–Willows cite no authority for the proposition that a contract must be executed before the subject matter of the agreement comes into being, and the Court is aware of none. What matters is that the parties executed a written agreement with the intent to settle the legal status of documents that were created just before, and that were enhanced after, the formal execution of the Danielson–Tellalian agreement on June 29, 1987.

■ Even if the words transferring copyright interests from Tellalian to Danielson were ambiguous, which the Court rejects, it is undisputed that Danielson and Tellalian agree that Danielson owns the copyright interests embedded in the drawings at issue in this case. On January 19, 1999, Donald Tellalian sent Edmond Danielson a letter in which he confirmed that Danielson *"retains* full copyright to [The Willows of Winchester project]." Edmond Danielson Aff.Ex. G (emphasis added). Later, on February 7, 2001, Donald Tellalian signed a statement affirming that Tellalian assigned any and all interests it once had in the Drawings at issue here to Danielson. *Id.* Ex. H. What these documents make clear is that, as between the original author (Tellalian) and the putative transferee (Danielson) of the copyright interests, there is no contest of ownership. What the law makes clear is that, when an author and a transferee do not dispute the ownership of a copyright interest, a third party may not raise the issue of copyright

ownership as a defense to a claim that it infringed the copyright. *E.g., Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 36 (2d Cir.1982) (noting that, in cases "in which the copyright holder appears to have no dispute with its licensee [over ownership of the copyright interest], it would be anomalous to permit a third party infringer to invoke [17 U.S.C. § 204(a)] against the licensee"), *superseded by rule on other grounds as stated in Weissmann v. Freeman*, 868 F.2d 1313, 1322 (2d Cir.1989); *accord Imperial Residential Design, Inc. v. Palms Dev. Group, Inc.*, 70 F.3d 96, 99 (11th Cir.1995) ("[W]here there is no dispute between the copyright owner and the transferee about the status of the copyright, it would be unusual and unwarranted to permit a third-party infringer to invoke section 204(a) to avoid suit for copyright infringement."); *Monroig v. RMM Records & Video Corp.*, 194 F.R.D. 388, 391 (D.P.R. 2000) (holding that section 204(a) "may not be invoked by an alleged infringer as a defense to avoid suit for copyright infringement."). The agreement between Tellalian and Danielson about Danielson's ownership of any copyright interests in the drawings at issue here preclude Winchester–Willows from arguing that Danielson lacks standing to sue Winchester–Willows for copyright infringement.

### 3. Copying

■ The question whether the defendant in an infringement action "copied" the work of the plaintiff is ordinarily one of the most intractable problems in copyright cases. The solution requires proof that the defendant copied the protected work as a factual matter, and that the allegedly infringing reproduction is "substantially similar" to the protected work. *Segrets*, 207 F.3d at 60. The issue is usually one left to the collective judgment of the jury, which may make comparisons between the putatively protected and the allegedly infringing works.

Surprisingly, this is not where the action is in this case. First, there is no doubt but that Winchester–Willows, through Medford, copied the Claim Drawings. Winchester–Willows acknowledges that Winchester–Conant acquired the Claim Drawings after it took title to the Property as a result of a foreclosure sale. Defs.' Facts ¶¶ 18–19. Deposition of Robert P. Pace ("Pace Dep.") at 33. By 1995, Winchester–Willows had met with no success developing the property except in accordance with the Restrictive Covenant, which incorporated by reference the Covenant Drawings. Defs. Facts ¶ 22; Edmond Danielson Aff.Ex. J § IV.E and Ex. B (Restrictive Covenant). As such, Winchester–Willows decided to build in accordance with the Restrictive Covenant, Defs.' Facts ¶ 22, which meant utilizing the Covenant Drawings, the Drawings in which Danielson held the copyright interests.

Winchester–Willows attempts to deflect the blame for the copying by arguing that Medford, not Winchester–Willows, did the physical copying of the Claim Drawings, either by cutting out or erasing Danielson's and Tellalian's logos from the Claim Drawings. Defs.' Opp'n ¶ 9; Summ.J. Hr'g Tr. at 8–9. Even if the Court assumes that Winchester–Willows did not know that Medford copied directly from the Claim Drawings, which is a stretch, it is legally irrelevant that Medford, and not Winchester–Willows, performed the physical copying of the Claim Drawings. As the Second Circuit observed in *Lipton v. Nature Co.*, 71 F.3d 464 (2d Cir.1995), "copying from a third source wrongfully copied from the plaintiff, without knowledge that the third source was infringing, does not absolve a defendant of liability for copyright infringement." *Id.* at 471; *see*

*also* 4 Nimmer & Nimmer, *supra*, § 13.08 (collecting cases that support the proposition that when a defendant's infringement is "based upon a work furnished by a third party," the defendant's "ignorance that such third party has wrongfully copied from the plaintiff will not immunize him from liability"). Winchester–Willows's lone factual response to Danielson's claim of copying—that Medford did the copying, not them—does not excuse Winchester–Willows from liability. Thus, as matter of law, Winchester–Willows copied Danielson's drawings.

But Danielson need also show that Winchester–Willows's works were substantially similar to the Claim Drawings. *Segrets,* 207 F.3d at 60. The adage "A picture is worth a thousand words" is particularly apposite here. A comparison of the Claim Drawings with the allegedly infringing drawings reveal that they are virtually, if not entirely, identical. *Compare, e.g.,* Edmond Danielson Aff.Ex. M (copy of Project Drawing C–4), *with id.* Ex. T (original of Project Drawing C–4, with the corner where Danielson's and Tellalian's logos originally appeared physically cut out of the drawing); *id.* Ex. M (copy of Project Drawing C–4), *with id.* Ex. W (copy of Project Drawing C–4, with Danielson's and Tellalian's logos removed from the copy); *id.* Ex. N (copy of Project Drawing L–1), *with id.* Ex. X (copy of Project Drawing L–1, with the logo of Meehan Architects of Meehan, New Hampshire in place of Danielson's and Tellalian's logo); *id.* Ex. K (copy of Project Drawing C–1), *with id.* Ex. Z (copy of Project drawing "C–1a," which is apparently identical to Project Drawing C–1, except that the logo of Meehan Architects has replaced Danielson's and Tellalian's logos). With respect to the Covenant Drawings, although the allegedly infringing drawings go into greater detail with respect to specific measurements, the shape, configuration, and layout of the buildings, open space, and parking remain

strikingly similar. *Compare id.* Exs. B–D (original Covenant Drawings SP–1, SP–2, and SP–3), *with id.* Exs. T–V (drawings depicting the Project, with Medford's logo on them but without Danielson's or Tellalian's logo). The Court concludes, therefore, that the resemblance between the Claim Drawings and the drawings that Winchester–Willows used to obtain approval to build the Project, is so great that no reasonable trier of fact could fail to find that the drawings are substantially similar. The Court therefore holds, as matter of law, that Winchester–Willows infringed Danielson's copyright interests in the Claim Drawings.

### 4. Winchester–Willows's Affirmative Defenses

The focus of this case is not on whether Winchester–Willows infringed Danielson's copyright in the Claim Drawings—they did—but rather on whether Danielson has been sufficiently diligent in protecting the copyright interests it has in the Claim Drawings to be entitled to relief. Winchester–Willows raise a number of affirmative defenses which boil down to an argument that Danielson's conduct, regardless of the nature of the work or the conduct of Winchester–Willows, ought deprive Danielson of any copyright protection it once had in the Claim Drawings. The Court examines each of Winchester–Willows's defenses, mindful that Danielson is entitled to every benefit of the doubt on these defenses before summary judgment will be granted in favor of Winchester–Willows.

#### a. Publication

■ Winchester–Willows's first affirmative defense is that Danielson published the Claim Drawings without a copyright notice, which suffices under the law as it existed at the time of the alleged publication to extinguish any copyright interests

Danielson may have had in the drawings. Defs.' Mem. at 2–7. Danielson responds that submission of architectural plans to developers and government agencies is only a "limited publication" that does not divest the copyright owner of its rights. Pl.'s Opp'n at 3–5. Danielson further asserts that it discharged its duty to protect its intellectual property rights by informing Conant Realty Trust in a written agreement that publication of any drawings did not extinguish Danielson's copyright interests. *Id.* at 6.

Under the Act as it existed at the time of the alleged publication, a notice of copyright was required to be placed on a copyrightable work at the time of publication. 17 U.S.C. § 401(a) (1982). Failure to do so resulted in invalidation of the copyright, absent one or more of three exceptions not applicable here. *See id.* § 405(a) (stating that "the omission of the copyright notice … from copies … publicly distributed by authority of the copyright owner does not invalidate the copyright in a work if" any of the three exceptions applies); 2 Nimmer & Nimmer, *supra,* § 7.14[A][1] ("The clear negative implication [of section 405(a)] is that if none of the these excusing conditions have been satisfied, then the omission of notice *does* invalidate the copyright."). Danielson admits that it did not place a copyright notice on the Claim Drawings, Defs.' Facts Ex. 5 ¶ 26 (admission by Danielson that no copyright notice was placed on the drawings), and Danielson does not suggest that its failure to do so is excused by any of the three exceptions to the requirement of notice found in section 405(a). Danielson is thus left to argue that it never "published" the Claim Drawings.

"Publication" is defined by the Copyright Act as follows:

'Publication' is the distribution of copies … of a work to the public by sale or other transfer of ownership, or by rent-

al, lease, or lending. The offering to distribute copies … to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication. A public performance or display of a work does not of itself constitute publication.

17 U.S.C. § 101. At first blush, Danielson's submission of the Covenant Drawings to the Town Planning Board and Board of Appeals would seem to constitute publication, as it amounts to an offer to distribute copies "to a group of persons for purposes of … public display." Danielson and Conant Realty Trust submitted to the Town a copy of the Covenant Drawings in anticipation of an application for a variance to develop land zoned for industrial use as a residential condominium complex. Edmond Danielson Aff. ¶¶ 6–7, 13. As was required by law, *see* Mass.Gen.Laws ch. 66, § 10(a), the Town made available to the public copies of the Covenant Drawings, Defs.' Facts ¶¶ 10–11; *see also* Edmond Danielson Aff. ¶ 19 (admitting that Danielson accepted input from "Farese, Town officials, interested members of the public who attended Town meetings, and others" in developing the plans). Under these facts as applied to the statutory definition of publication, Danielson's case against publication would appear weak.

But Danielson fires back with a barrage of cases holding that submission of plans by architects to developers, subcontractors, consultants, and government authorities does not amount to publication in derogation of the architect's rights. Pl.'s Opp'n at 3–4. In *Kunycia v. Melville Realty Co.,* 755 F.Supp. 566 (S.D.N.Y. 1990), for example, a federal district court, relying upon the definition of publication found in section 101 of the Copyright Act, concluded:

Distribution of plaintiff's architectural drawings to contractors, landlords and

building authorities does not constitute a publication requiring copyright notice. Plaintiff's drawings were circulated only to entities directly involved in the construction of [the project]. The distribution was restricted to those persons without whose participation the plans could not be given practical effect. Implicit in these business relationships is the understanding that such a distribution does not convey the right further to diffuse, reproduce, distribute or sell the drawings without the architect's permission. Whether this is termed a 'limited publication' or no publication at all, the effect is the same: plaintiff's drawings did not pass into the public domain. *Id.* at 574; *accord, e.g., Codespoti & Assocs., P.C. v. Bartlett,* 51 F.Supp.2d 125, 128 (D.Conn.1999) ("Submitting proposed site plans to the town does not put those site plans in the public domain and deprive them of protection under the copyright law."); *Intown Enters., Inc. v. Barnes,* 721 F.Supp. 1263, 1266 (N.D.Ga.1989) ("The weight of authority holds that neither the filing of architectural plans with permitting authorities nor distributing such plans to subcontractors for bidding purposes constitutes publication under the Copyright Act."); 1 Nimmer & Nimmer, *supra,* § 4.10 ("Placing a work in a public file . . . clearly does not constitute an act of publication.").

To follow these cases simply because they came before this case, however, would be superficial. As Oliver Wendell Holmes said:

It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past.

Oliver Wendell Holmes, *The Path of the Law,* 10 Harv.L.Rev. 457, 469 (1897), *reprinted in* 110 Harv.L.Rev. 991, 1001 (1997). What is clear, however, is that the reasons for such a rule remain vital.

In *Edgar H. Wood Associates, Inc. v. Skene,* 347 Mass. 351, 197 N.E.2d 886 (1964), the Massachusetts Supreme Judicial Court rejected the notion that submission of architectural plans to a government body eviscerates the architect's common law copyright claims, on the ground that "the principal objective of [the government] in compelling a filing is to ensure that the public will be protected from unsafe construction." *Id.* at 362, 197 N.E.2d 886. Although the provisions for obtaining a zoning variance and a special permit set out in Chapter 40A of the Massachusetts General Laws do not appear to *require* an architect to submit plans in order to obtain a variance or a special permit to build,[2] it is hard to imagine that an architect would not, at some point during the process of seeking a variance or a special permit, be asked to produce drafts of what she or he was planning to build on the land. This is particularly so with respect to a large housing development such as the one at issue here, which required Danielson and Conant Realty Trust to seek a variance permitting them to build residential units in an area zoned for industrial use. A planning board would be particularly inter-

---

**2.** Winchester–Willows suggest that submission of architectural plans to local governments in Massachusetts is entirely volitional, which in their view bolsters their claim that Danielson published its drawings. *E.g.,* Hrg. Tr. at 4. Winchester–Willows acknowledge, however, that submitting such plans would be extremely helpful in obtaining such a variance or permit. *Id.* The fact that the distribution was volitional under state law, as opposed to mandatory, does not alone lead to the conclusion that Danielson relinquished its copyright interests in the drawings. Winchester–Willows cite no law to support this proposition, and the Court is aware of none.

ested in seeing plans before allowing such a radical shift in the tenor of the zoning district, to ensure that the proposed new development will be built safely and in such a way as to integrate with the local community as much as possible. *See* Mass.Gen.Laws ch. 40A, § 9 (permitting special permits only when the use of the property proposed by the request is "in general harmony with the general purpose and intent" of the governing zoning ordinance); *id.* § 10 (permitting variances only where the "permit granting authority specifically finds that," in light of the particular nature of the property at issue, allowing a variance will relieve the variance petitioner of "substantial hardship" without imposing "substantial detriment to the public good and without nullifying or substantially derogating from the intent or purpose of such ordinance or by-law").

Winchester–Willows cite *Certified Engineering, Inc. v. First Fidelity Bank, N.A.*, 849 F.Supp. 318 (D.N.J.1994), for the proposition that "the publication of the subdivision plans is much more extensive and the distribution of subdivision plans within the public domain is much more widespread than is the publication or distribution of architectural plans for a house or a store," *id.* at 324, suggesting that submission of housing development plans represents divestive publication, Defs.' Mem. at 3–4. The court in *Certified Engineering* suggested, as do Winchester–Willows, that the greater scope of dissemination of drawings in connection with a subdivision plan vis-a-vis a single house or building, along with the greater ease with which plans for a single house or building may be pirated vis-a-vis a site-specific subdivision plan, warrant carving out a kind of subdivision plan "exception" to the general rule that submission of architectural plans to parties connected with the construction of the structure does not constitute publication. *Certified Eng'g*, 849 F.Supp. at 324; Defs.' Mem. at 3–4.

The problem with this approach is that it trivializes the purposeful nature of the architect's distribution of the plans at issue, as well as the role of those who see the documents in question. It may be true that more people will see subdivision or residential development plans than plans for a single house or commercial building, but that is because state and local law usually require municipalities to notify the community of a proposed development and solicit input. *E.g.*, Mass.Gen.Laws ch. 40A, §§ 9, 10; *id.* ch. 66, § 10. In this case, those who saw the work were those who attended a Town meeting to comment on the impact that such a new development would have on the community. The dissemination of the plans at issue here, while not necessarily compelled by the applicable state statutes or local ordinances, was certainly in furtherance of the Town's obligation under state law to solicit input from the community and make findings regarding the desirability of allowing residential development in an area zoned for industrial use.

Moreover, it is not clear, as the court in *Certified Engineering* suggested, that plans for a single house or commercial building are easier to pirate than "site-specific" housing development plans, and thus warrant greater copyright protection than do subdivision plans. While it is true that a subdivision plan takes account of the particular features of the land upon which it is to be built, thus perhaps making it harder to use lock, stock, and barrel elsewhere, there is no reason to suggest that subdivision plans are not also desirable targets of pirating. Within a particular town or region, a particular subdivision plan or copyrightable elements of the plan may become popular because it has achieved success in winning the approval of a local planning board, or because it has resulted in the sale of a number of housing units. If anything, there is more to be

reaped from pirating a subdivision plan than there is to be gained by pirating a single house or building plan, as the profits from designing a single subdivision may be much greater than the profits from designing a single house.

The arguments put forth by Winchester–Willows and the court in *Certified Engineering* do not provide an adequate basis upon which to depart from the rule, endorsed in the vast majority of cases and buttressed by sound public policy considerations, that an architect's submission of plans to those involved in the development and execution of the plans does not constitute publication that divests the architect of rights under the Copyright Act. To be sure, Danielson could have done more to protect its copyright interests in the drawings at issue here, and will no doubt do more to protect its interests in the future. But the Court rejects Winchester–Willows's suggestion that Danielson published its drawings when it pursued a variance and a special permit along with Conant Realty Trust to build the Project.

### b. Implied License

Winchester–Willows next argues that Danielson's conduct in allowing the Covenant Drawings to become part of the Restrictive Covenant, which was to run with the land for 30 years, amounted to an "implied nonexclusive license" that allowed "successors in title" to the property, such as Winchester–Conant and Willows LLC, to use the Claim Drawings to develop the site in compliance with the Restrictive Covenant. Defs.' Mem. at 7–9. Otherwise, according to Winchester–Willows, Danielson would effectively be granted a 30–year monopoly over any development of the site. *Id.* at 8–9.

■ There is no question that the owner of a copyright (in this case, Danielson, as a result of the contract between Danielson and the author of the plans, Tellalian), may grant a nonexclusive license to another party to use and copy an otherwise protected work. *E.g., Johnson v. Jones,* 149 F.3d 494, 500 (6th Cir.1998); *I.A.E., Inc. v. Shaver,* 74 F.3d 768, 775 (7th Cir.1996); *Effects Assocs., Inc. v. Cohen,* 908 F.2d 555, 558–59 (9th Cir.1990). In contrast to an exclusive license, a nonexclusive license does not amount to a transfer of copyright ownership. *See* 17 U.S.C. § 101 (defining "transfer of copyright ownership" to include exclusive licenses, but not nonexclusive licenses). Therefore, a nonexclusive license is not governed by the statute of frauds provision of 17 U.S.C. § 204, and may be granted "orally, or may even be implied from conduct." 3 Nimmer & Nimmer, *supra,* § 10.03[A][7]. The existence of a nonexclusive license, if granted to the defendant in an infringement action, operates as an affirmative defense to a claim of infringement. *Johnson,* 149 F.3d at 500; *Shaver,* 74 F.3d at 775; *Effects,* 908 F.2d at 559.

■ There is no magic formula to determine whether the owner of a copyright has granted a nonexclusive license to the alleged infringer or others. "When the totality of the parties' conduct indicates an intent to grant such permission, the result is a nonexclusive license." 3 Nimmer & Nimmer, *supra,* § 10.03[A][7]. Such a nonexclusive license may also be found where the copyright owner has granted "consent, in the form of mere permission or lack of objection" to the would-be infringer. *Shaver,* 74 F.3d at 775. Several courts have attempted to formulate a test to determine when a nonexclusive license exists, stating that one may be implied when "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his

work." *Shaver*, 74 F.3d at 776 (citing *Effects*, 908 F.2d at 558–59). With this guidance in mind, the Court turns to the facts of this case.

■ Danielson (through Tellalian) originally produced the drawings at the direction of Conant Realty Trust and Farese. The drawings were created pursuant to an agreement between Danielson and Conant Realty Trust.[3] The agreement specifically provided that the drawings produced in connection with the project "are and shall remain the property of [Danielson]." Edmond Danielson Aff.Ex. A, art. 8.1. While Conant Realty Trust and Farese were allowed to retain copies of the drawings, the agreement stated that "[t]he Drawings ... shall not be used by [Conant Realty Trust] on other projects, for additions to this Project, or for completion of this Project by others." *Id.* The drawings were submitted, pursuant to the agreement between Danielson and Conant Realty Trust, to the Town Planning Board and Board of Appeals in order to obtain permission to build a residential complex in an area otherwise zoned for industrial use. *Id.* ¶¶ 6–7. The Town made the plans available to members of the public, as is required by law, Mass.Gen.Laws ch. 66, § 10(a), in order that members of the Town could vote on whether to allow the Project to go forward. Winchester–Conant did not obtain the Claim Drawings directly from Danielson, but instead obtained the drawings as a result of the foreclosure sale that took place after Conant Realty Trust defaulted.

The facts in this case closely resemble those in the Sixth Circuit's decision in *Johnson*. There, an architect developed plans to build a dream home for a client, but was terminated due to difficulties negotiating a final contract. 149 F.3d at 497–99. The client retained another architect who, on the advice of the client's lawyer, resubmitted the original architect's plans, this time without the original architect's logo, to the city inspector to obtain permission to continue building. *Id.* at 499. The client and the second architect conceded that they copied the plans, but argued that the original architect had granted them an implied nonexclusive license to continue building with the original plans. *Id.* at 500.

The court rejected the defendants' arguments, finding that "almost every objective fact ... points away from the existence of an implied license." *Id.* Two facts were particularly important to the court in *Johnson*. One was the existence of two AIA standard form contracts nearly identical to the one in this case, which provided that the plans created by the original architect "*shall not be used by the owner or others* on other projects ... or *for completion of this Project by others ... except by agreement in writing with appropriate compensation to the Architect.*" *Id.* at 498. Even though these contracts were never signed by any of the defendants, the court found the contracts to be instructive on the issue of the original architect's intent to retain control over the design and construction of the home. *Id.* at 500.

---

**3.** The Court is unimpressed by Winchester–Willows's suggestion that, because the original Covenant Drawings were completed before the contract between Danielson and Conant Realty Trust was executed on June 29, 1987, Defs.' Opp'n ¶ 1, the contract does not cover the Covenant Drawings, *id.* at 7. The clear intent of the parties, manifested in the June 29, 1987 contract between Danielson

and Conant Realty Trust, was that Danielson owned *all* of the documents prepared in connection with the Project, including those prepared in anticipation of "filing documents required for the approval of governmental authorities having jurisdiction over the Project," Edmond Danielson Aff.Ex. A, art. 1.3.4, to wit, the Covenant Drawings.

Likewise, here neither Winchester–Conant nor Willows LLC signed the agreement between Danielson and Conant Realty Trust, but that agreement signaled Danielson's intent not to relinquish control over the use of the Claim Drawings.

The second important fact in *Johnson* was that the defendants in that case did not acquire the plans for the home from the plaintiff directly, but instead obtained them from the client and the city inspector's office, where they had been submitted by the original architect in pursuit of a building permit. As in that case, here Winchester–Willows obtained copies of the plans not from Danielson, but instead as a result of the foreclosure of the Property. As in *Johnson*, these facts point away from a conclusion that Danielson granted an implied nonexclusive license to Winchester–Willows.

 Not surprisingly, then, Winchester–Willows point to other facts that they claim created an implied nonexclusive license. Winchester–Willows emphasize that the Covenant Drawings "were made a part of the record title of the site, binding any successor in title." Defs.' Mem. at 8. This means, according to Winchester–Willows, that Danielson "affirmatively consented to ... use [of the drawings] at the Site by any successor in title including [Winchester–Willows]." *Id.*

Winchester–Willows's account of the facts skips over a few critical steps. First, Danielson submitted the drawings to Conant Realty Trust at Conant's request, but pursuant to a contract that expressly forbade Conant Realty Trust to use the drawings in any way other than in connection with the Project and with any architect other than Danielson. Edmond Danielson Aff.Ex. A, art. 8.1. The contract between these parties required Danielson to assist Conant Realty Trust in submitting the drawings to the Town to achieve permission to build the residential project. *Id.*

art. 1.3.4. While it is not clear that such a submission to the Town was legally required to obtain a variance and a special permit to build, it is hard to imagine that the Town would not at some point have asked to see what Danielson and Conant Realty Trust planned to build on the Property before the Town allowed them to build it, particularly as a grant of permission to build the Project required making an exception to the zoning ordinance for the Property. The Town then made the drawings available to the general public, as it was legally required to do. At no point did Danielson's conduct (or lack of conduct) demonstrate a willingness to allow use of the drawings without Danielson's permission. In fact, the only parties with whom Danielson was in privity, Conant Realty Trust and Tellalian, were expressly forbidden to do so.

As Winchester–Willows's implied nonexclusive license argument progresses, it relies less on facts and more on an admittedly creative legal theory. Winchester–Willows cites *Building Officials & Code Administrators International, Inc. v. Code Technology, Inc.*, 628 F.2d 730 (1st Cir.1980), for the proposition that once a privately-developed work is incorporated into public law—in that case, a privately-compiled model building code was incorporated in the body of Massachusetts building regulations—the private developer loses any copyright interests in the work, whether it be under the rubric of implied nonexclusive license, merger, or publication. Defs.' Mem. at 8–9. The rationale for this proposition is that "citizens must have free access to the laws which govern them," *Building Officials*, 628 F.2d at 734; allowing copyright protection for such documents would impair the public's access to the law that governs (and potentially sanctions) them, and could raise due process concerns. *Id.* at 734–35. Winchester–Willows contend that when the architec-

tural plans became part of the Restrictive Covenant, they became law, much like a model building code that is adopted by a government body.

Winchester–Willows's reliance on *Building Officials* is misplaced. In *Del Madera Properties v. Rhodes & Gardner, Inc.*, 637 F.Supp. 262 (N.D.Cal.1985), a court rejected an identical argument, also based on *Building Officials*, with respect to a subdivision plan that was adopted by a town council. There the court observed that "[u]nlike the building code at issue in [*Building Officials* ], the [subdivision plan] is not a self-executing ordinance.... The [subdivision plan] itself was merely approved and was not transformed by this act into law." *Id.* at 264. Likewise, here it is not the architectural plans that are the binding law, but rather the Restrictive Covenant, approved by the Town, that requires construction in conformity with the plans. *See also County of Suffolk v. First. Am. Real Estate Solutions*, 261 F.3d 179, 193–95 (2d Cir.2001) (rejecting argument that otherwise copyrightable property tax maps entered public domain when they were adopted by county, in part because "the tax maps themselves do not create the legal obligation to pay property taxes," but instead the statute that incorporates the tax maps creates the obligation). While it may appear to be splitting hairs to distinguish between a law or regulation (here, the Restrictive Covenant) and a work incorporated by reference into the law or regulation (here, architectural drawings), there is a compelling policy reason to make such a distinction in a case like this. In light of the fact that many state and local governments presumably require submission and approval of architectural plans prior to granting permission to build, treating architectural plans the way the First Circuit treated model codes in *Building Officials* would eviscerate the copyright protection architectural plans have been understood to enjoy for so long.

The Court therefore declines to lump architectural plans in with model codes and treat them as the court in *Building Officials* treated such codes.

Even if the Court indulged Winchester–Willows's assumption that architectural plans are like model codes, the First Circuit opinion in *Building Officials* does not *compel* this Court to hold that the architectural drawings have entered the public domain. As other courts have observed, the First Circuit in *Building Officials* did not hold definitively that model codes enter the public domain when they are adopted by government bodies. *E.g., Veeck v. S. Bldg. Code Cong. Int'l, Inc.*, 241 F.3d 398, 403 & n. 14 (5th Cir.2001), *reh'g en banc granted*, 268 F.3d 298; *Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*, 121 F.3d 516, 519–20 (9th Cir.1997); *CCC Info. Servs., Inc. v. Maclean Hunter Market Reports, Inc.*, 44 F.3d 61, 73–74 (2d Cir. 1994). Instead, the First Circuit merely vacated a preliminary injunction granted by the district court based on the lower court's assumption that the state's adoption of the model code did not place the code into the public domain. Importantly, however, the First Circuit also remanded the case for further development of the competing policy considerations at stake. *Building Officials*, 628 F.2d at 736.

The First Circuit, therefore, has never definitively decided whether privately-developed works, once adopted by government bodies in public enactments, enter the public domain and lose their status as copyrightable works. Three other circuits have, however, and they have all held that such an adoption does not extinguish the copyright interest in the adopted work. *Veeck*, 241 F.3d at 403–07 (holding that a privately-developed model building code did not enter the public domain by virtue of being adopted by municipal governments); *Practice Mgmt.*, 121 F.3d at 518–

20 (holding that an American Medical Association catalogue of medical procedures did not lose its copyright when it was incorporated into federal regulations governing Medicare and Medicaid reimbursement); *CCC Info. Servs.*, 44 F.3d at 73–74 (holding that a privately-developed guide to used car valuation did not enter the public domain after it was incorporated into several states' insurance statutes and regulations). These three circuits have reached a contrary and, in the Court's view, more sensible conclusion than the one reached tentatively by the First Circuit in *Building Officials*.

There are several reasons why the rule adopted by the Second, Fifth, and Ninth Circuits makes more sense than the one embraced by the First Circuit. First, the due process concern that drove the First Circuit to its decision in *Building Officials* —the concern that "citizens must have free access to the laws which govern them," 628 F.2d at 734, and that copyright protection for these types of works might constrict entirely citizens' access to the laws, *id.* at 734–35—has proven largely to be a paper tiger, as matter of fact and law. As matter of fact, once the copyright owner makes the work available to the government, there is little doubt that citizens will have some quantum of access to the work. *See Veeck*, 241 F.3d at 403 & n. 17 (finding no evidence on summary judgment record that putative infringer was denied access to law by virtue of copyright holder's copyright). This is because it would be completely contrary to the copyright owner's interest to prevent broad dissemination of the work, as this is presumably the way the copyright owner will attract new consumers of the work. *See Practice Mgmt.*, 121 F.3d at 519. At this point, the issue is no longer whether the people will have *access* to the work, but rather whether they may *copy* the work. *Id.* ("There is no evidence that anyone wishing to use the [work] has any difficulty obtaining access to it. [The declaratory judgment plaintiff] is not a potential user denied access to the work, but a putative copier wishing to share in the [copyright holder's] statutory monopoly.") (citation omitted). As matter of law, were a copyright owner, in contravention of her own pecuniary interests, to constrict entirely the citizenry's access to the work, an action for breach of contract by the government, or legal defenses available to would-be infringers such as due process or fair use, would allow citizens to maintain access to the work. *Practice Mgmt.*, 121 F.3d at 519 & n. 7; 1 Nimmer & Nimmer, *supra*, § 5.06[C].

Second, the balance of competing interests at stake in such cases favors preserving copyright protection for works incorporated by reference into public enactments. As the First Circuit recognized in *Building Officials*, private groups who develop model codes and similar works "serve an important public function; arguably they do a better job than could the state alone in seeing that complex yet essential regulations are drafted, kept up to date and made available." 628 F.2d at 736. If private groups were forced to give up their copyright interests once a government entity enacted their works into law, there would be little incentive to create such works, or at least to offer them to the government. *Practice Mgmt.*, 121 F.3d at 518–19; *County of Suffolk*, 261 F.3d at 194; 1 Nimmer & Nimmer, *supra*, § 5.06[C]. Government and governance would suffer, as individual governing bodies would be forced to foot the bill to develop their own housing codes and architectural plans, and economies of scale that private groups can achieve would be lost. This is a concern that properly factored into the court's equation in *Building Officials;* but that court miscalculated the degree to which preserving copyright interests in such works would impair citizens' access to the law that binds them. Later

decisions from other courts have adjusted this variable.

Had the rule endorsed in *Building Officials* been the product of a "final" legal decision, the Court would be bound to follow it, however ill-advised the rule might be. Fortunately, the Court is not so bound. The Court therefore declines to follow *Building Officials,* but instead adopts the rule set out in *Veeck, Practice Management,* and *CCC Information Services,* that otherwise copyrightable works, such as model codes and architectural plans, do not lose copyright protection when they are adopted by government bodies or incorporated by reference into public enactments.

For the above reasons, the Court rejects Winchester–Willows's argument that Danielson granted them or others an implied nonexclusive license, either as matter of fact or as matter of law, to use the Claim Drawings.

### c. Merger

■ Winchester–Willows briefly suggest that the doctrine of merger—which withdraws copyright protection from ideas that are susceptible of only one form of expression—destroys Danielson's copyright interests here, because "the Covenant Drawings and the Restrictive Covenant in which they are embodied have become part of the title to the site, [and thus] there is now only one way the site can be developed." Defs.' Mem. at 8 & n. 8. Danielson counters that because the Property did not, "by its physical nature or configuration," compel one form of expression of ideas in the drawings, the drawings at issue here do not "merge" into an idea and thereby lose copyright protection. Pl.'s Opp'n at 9–10.

The Court agrees with Danielson. The fact that a government entity adopts a particular design scheme for a property does not cause that scheme to "merge" with the unprotected idea of developing the property. Winchester–Willows do not suggest that the Property itself could only be developed in one way. If that were the case, then the architectural plans would become one with the Property, and granting copyright protection to such plans would amount to granting a monopoly over development of the land to the copyright owner. *Kunycia v. Melville Realty Co.,* 755 F.Supp. 566, 570–71 (S.D.N.Y.1990) (acknowledging that a design may lose copyright protection because of "inherent limitations on the ways in which an idea (or design) can be expressed," but declining to find such limitations as matter of fact, because plaintiff presented evidence showing that there were "various ways" in which the buildings at issue could be designed). Here, the only limitation on the way in which the Property could be developed was the Restrictive Covenant, which required that construction of the property proceed in accordance with the Covenant Drawings. Danielson Aff. ¶ 14 & Ex. J, § IV.E. This limitation could be overcome, however, by a vote of two-thirds of those present at a Town meeting. *Id.* § IV.J. Indeed, on several occasions Winchester–Willows came very close to achieving the necessary two-thirds vote to change the Restrictive Covenant, Deposition of Kent Brown ("Brown Dep.") at 177–78, and on one occasion garnered "62 or 63 percent of the vote" of the Town, *id.* at 177. That Winchester–Willows were ultimately unsuccessful in overcoming such a limitation does not mean that the obstacle was insurmountable. It certainly does not mean that the drawings at issue here became the *only* way the property could be developed.

The Court therefore rejects Winchester–Willows's merger argument. The doctrine of merger requires courts to engage in a delicate balancing act between the conflicting policies that, on one hand, ideas are not protected by the Copyright Act, 17 U.S.C. § 102(b), but on the other, protect-

able expressions usually include or are based on unprotected ideas, *see CCC Info. Servs.*, 44 F.3d at 68–73. When application of the merger doctrine would prove "too destructive" of protection traditionally afforded to certain works under the Copyright Act, *id.* at 72, such application ought be avoided. Here, copyright protection traditionally afforded to architectural drawings would be gutted were the doctrine to apply every time a government body incorporated the drawings into a zoning variance, restrictive covenant, or special permit to build.

### d. Abandonment

■ Winchester–Willows's next attack on Danielson's copyright claim is its claim that Danielson abandoned its copyright in the work. Abandonment operates as a legal defense to a claim of infringement, however, "only if there is an intent by the copyright proprietor to surrender rights in his work." 4 Nimmer & Nimmer, *supra*, § 13.06. This proposition has been taken by courts to require an "overt act" manifesting an intent to abandon the copyright. *E.g., Micro Star v. Formgen Inc.*, 154 F.3d 1107, 1114 (9th Cir.1998); *Paramount Pictures Corp. v. Carol Publ'g Group*, 11 F.Supp.2d 329, 337 (S.D.N.Y.1998). Here, the only overt signal of Danielson's intent was its agreements with Conant Realty Trust and Tellalian, in which it stated that the Claim Drawings belonged to Danielson, and were not to be used by Conant Realty Trust or Tellalian "on other projects" or "for completion of this Project by others." Edmond Danielson Aff. ¶ 4 & Ex. A, art. 8.1; *id.* Ex. F, art. 8.1. Every submission, distribution, or display of the drawings subsequent to these agreements was made pursuant to Danielson's obligation to assist in the process of obtaining

approval from the Town to build on the Property in accordance with the plans. Danielson's conduct might not have been as careful as it could have been, but there is no evidence on the record that Danielson affirmatively abandoned its copyright interests in the plans. The Court therefore rejects Winchester–Willows's argument on this point.

### e. Statute of Limitations

The final arrow in Winchester–Willows's quiver with respect to Danielson's copyright claim is their argument that Danielson waited too long to bring an action for copyright infringement, and is now barred by the three-year statute of limitations of the Copyright Act, 17 U.S.C. § 507(b). Danielson filed suit on May 23, 2000. According to Winchester–Willows, the latest point at which Danielson's claim could have become apparent was in 1995, more than three years earlier, when one of Winchester–Willows's agents "admits he copied a number of the Registered Drawings." Defs.' Mem. at 11.

■ The statute of limitation for a Copyright Act claim is three years from the time when the claim "accrued." 17 U.S.C. § 507(b). A claim for copyright infringement is generally considered to have accrued when "one has knowledge of a violation or is chargeable with such knowledge." *Hotaling v. Church of Jesus Christ of Latter–Day Saints*, 118 F.3d 199, 202 (4th Cir.1997); *accord Roley v. New World Pictures, Ltd.*, 19 F.3d 479, 481 (9th Cir.1994). A plaintiff is "chargeable with knowledge" when a reasonably diligent person in the plaintiff's position would have become aware of the infringement. *See Stone v. Williams*, 970 F.2d 1043, 1048 (2d Cir.1992).[4]

**4.** A plaintiff may also be chargeable with knowledge when the plaintiff's agent or employee is notified by a third party of the alleged wrongdoing. *See* Defs.' Mem. at 12– 13 (suggesting that notice to Tellalian of potential infringement in 1994 sufficed to charge Danielson with knowledge of the in-

Contrary to Winchester–Willows's suggestion, Danielson has identified a genuine issue regarding when, in the exercise of reasonable diligence, it knew or should have known of Winchester–Willows's infringement of the Claim Drawings. According to Danielson, Edmond Danielson immediately took action upon being apprised in August 1997 by his associate, George Elanjian, of the potential copyright infringement by Winchester–Willows. Edmond Danielson Aff. ¶ 27, 44. That same month, Edmond Danielson sent a letter to his attorney to inform him of what Elanjian had discovered. *Id.* ¶ 44 & Ex. AA. By October 1997, Danielson had hired two new attorneys to replace Danielson's previous counsel, who could not take the case. *Id.* ¶ 44. On December 29, 1997, Danielson's attorneys wrote their first letter to Winchester–Willows informing them of their concerns about the copyright infringement, demanding that they cease using the plans, and seeking to resolve the dispute short of litigation. Id. ¶ 44 & Ex. CC. Attempts to resolve the dispute without resorting to litigation lasted for two years. *Id.* ¶ 45. On September 10, 1999, Danielson sent a draft complaint to Winchester–Willows, which was filed with this Court on May 23, 2000. *Id.* ¶ 45. If all of this happened the way Edmond Danielson says it did in his affidavit and his August 25, 1997 letter to his attorney, then the filing of the complaint on May 23, 2000 fell comfortably within the three-year statute of limitations for copyright infringement actions. It is thus inappropriate to grant Winchester–Willows summary judgment on this point, as a reasonable trier of fact could find on these facts, interpreted favorably to Danielson, that Danielson's copyright claim is not time-barred.

Winchester–Willows dispute that the earliest Danielson knew or should have known of the alleged infringement was August 1997, and dispute that Danielson acted with dispatch in addressing the alleged wrong. According to Winchester–Willows, in April 1994, Kent Brown, a representative of Winchester–Willows, met with Edmond Danielson to discuss possible development scenarios for the Property. Defs.' Facts ¶ 19. Brown testified at a deposition that he showed Edmond Danielson a copy of the original drawings at this April 1994 meeting. Brown Dep. at 153. At a meeting between the same parties in July of the same year, Edmond Danielson wrote down that one of the possibilities for developing the Property was to "[u]se [the original] Willows Design and Finish." *Id.* Ex. 15 (handwritten notes of Edmond Danielson, dated July 25, 1994). Winchester–Willows also point out that Edmond Danielson admits that he drove by the Project at least once in 1994, and again in 1996. Defs.' Opp'n ¶¶ 14, 16. In 1994 Edmond Danielson saw what Winchester–Willows claim was the allegedly infringing sign depicting the new development (copying from Covenant Drawing A–3), *id.* ¶¶ 14. Testimony from Edmond Danielson's deposition, however, suggests that the sign he observed on the property when he drove by in 1994 was of the original Project, and bore Danielson's name. Defs.' Facts Ex. 11, at 75–76. According to Winchester–Willows, on neither of these occasions did Edmond Danielson drive onto the property that they were develop-

---

fringement due to a relationship between Danielson and Tellalian as "principal and agent"). Even if Winchester–Willows's statement of the law on this point is correct, their account of the facts is not. Danielson and Tellalian were not in a principal-agent relationship. The contract between them indicates that "[Tellalian] is [Danielson's] independent consultant for This Part of the Project ... and is not a joint venturer with [Danielson]." Edmond Danielson Aff. ¶ 8 & Ex. F, art. 2.2.

ing to inquire about any construction that was going on.

What is clear from this review of the relevant facts is that the parties answer the question of who knew what when very differently. When Danielson knew, or in the exercise of reasonable diligence should have known, that actionable wrongdoing took place in this case, is a fact-intensive issue best left to a jury. The Court is confident that a jury, which will hear live testimony from conflicting witnesses and may assess the credibility of those witnesses, will be able to make a reasoned determination regarding when Danielson, in the exercise of reasonable diligence, knew or should have known that Winchester–Willows copied its plans. Summary judgment on the question whether Danielson's copyright claim is barred by the statute of limitation is therefore inappropriate.[5]

### 5. Damages

If Winchester–Willows prevails at trial on the issue of the statute of limitations, Danielson's copyright claim vanishes. If, however, Danielson wins on the statute of limitations issue, Danielson may proceed to prove damages, defined by the Act as "the actual damages suffered by [the plaintiff] as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b). In establishing the amount of profits attributable to the infringement, the plaintiff "is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." *Id.*

On the record before it at summary judgment, the Court is not prepared to determine a damage award, or to foreclose possible factors "other than the copyrighted work" that may be responsible for Winchester–Willows's profits and thus deductible from the total damage award. The statute is clear on what damages Danielson is entitled to if it wins, and on the allocation of burdens of persuasion in a damages calculation. It will be more appropriate to make legal rulings on damages, if any, after the parties have had a full opportunity to address the issues at trial.

### B. Lanham Act Claim

Danielson also seeks relief under the Lanham Act, 15 U.S.C. § 1125, which creates a cause of action against "[a]ny person who ... uses in commerce ... any false designation of origin ... which is likely to cause confusion, or to cause mistake, or to deceive as to ... the origin" of the goods. *Id.* § 1125(a). The garden variety "false designation of origin" claim involves an

---

5. The Court rejects Winchester–Willows's assertion that Danielson's claim is barred by the equitable claim of laches. "Mere delay on the part of a copyright owner in pursuing an infringement claim will not create a bar on the ground of laches unless such delay is inexcusable and prejudicial to the defendant by reason of his reliance or change of position as a result of such delay." 3 Nimmer & Nimmer, *supra,* § 12.06. There is no evidence on the record before the Court of deliberate or inequitable delay on the part of Danielson upon which Winchester–Willows relied to their detriment. To the contrary, assuming

that Danielson's infringement claim otherwise satisfies the statute of limitations, Danielson put Winchester–Willows on notice of its concerns soon after it supposedly learned of the infringement, and spent the next two years trying to resolve the case without resorting to litigation. Edmond Danielson Aff. ¶ 45 & Exs. CC, DD. Discussing settlement and alternatives to litigation are commendable rather than inequitable reasons to delay filing a complaint until late in the statute of limitations period. *Encyclopaedia Britannica Educ. Corp. v. Crooks,* 447 F.Supp. 243, 252–53 (W.D.N.Y.1978).

allegation that the defendant is using a mark, such as a trademark, that is so similar to the plaintiff's that the public is likely to confuse the plaintiff's and defendant's goods or services. In such a case, the defendant capitalizes illegally upon plaintiff's reputation or goodwill among consumers.

This is a slightly different case. It is very similar to the Sixth Circuit's decision in *Johnson v. Jones*, 149 F.3d 494 (6th Cir.1998). There, the plaintiff alleged that defendant, a competing architect, copied plaintiff's drawings, removed plaintiff's name and seal, and replaced them with his own name and seal. *Id.* at 499. In affirming the district court's finding that the defendant was liable under the Lanham Act, the court observed:

> Here, the defendant has not produced a product to which he has applied a mark so like the plaintiff's that the public is likely to believe that the product was produced by the plaintiff. Rather, the defendant has taken the plaintiff's product and has represented it to be his own work. It is difficult to imagine how a designation of origin of a product could be more false, or could be more likely to cause confusion or mistake as to the actual origin of the product....
>
> Furthermore, it is obvious beyond dispute that by taking [plaintiff's] name and seal off of the plans and replacing them with his own, [defendant] intended for people to assume that the plans were his, and not [plaintiff's]. Indeed, this Court is hard-pressed to imagine what effect these actions could possibly have other than to convince anyone who looked at the plans that they were [plaintiff's] work. Few are the cases demonstrating a more obvious and imminent likelihood of confusion.

*Id.* at 503.

Likewise, in this case Medford's physical removal of the logos of Danielson and Tel-lalian from the Claim Drawings could have only one effect: to make others believe that Medford was the sole author of the Claim Drawings. Nevertheless, the Court refrains from entering judgment as matter of law on this claim for Danielson, as the parties have not adequately briefed this issue, and ought be given an opportunity further to hone their arguments at trial. The Court also reserves judgment on the issue of damages, if any, that are available to Danielson upon a showing that Winchester–Willows violated the Lanham Act. Determination of damages will turn on the existence and degree of injury suffered by Danielson as a result of the allegedly deceptive trade practice perpetrated by Winchester–Willows, and on the level of culpability on the part of Winchester–Willows that Danielson is able to demonstrate. *See Aktiebolaget Electrolux v. Armatron Int'l, Inc.*, 829 F.Supp. 458, 461–67 (D.Mass. 1992) (Woodlock, J.) (discussing computation of damages in Lanham Act cases), *aff'd*, 999 F.2d 1 (1st Cir.1993).

## C. State Law Claims—Preemption

Winchester–Willows posit that Danielson's two state law counts—conversion (Count II), Am.Compl. ¶¶ 93–100, and violation of Chapter 93A (Count IV), *id.* ¶¶ 104–09—are preempted by the federal Copyright Act, and thus may not provide separate avenues of relief for Danielson. Defs.' Mem. at 9–10.

 The Copyright Act states that "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of [the Act]" are subsumed within the Act and preempted by it. 17 U.S.C. § 301(a). Two criteria must be met in order for a state law claim to be preempted by the Act:

> First, the work of authorship in which rights are claimed must fall within the subject matter of copyright as defined

by [17 U.S.C.] §§ 102 and 103 . . . . The second condition is that the state created right must be equivalent to one of the exclusive rights created by the Copyright Act.

*Data Gen. Corp. v. Grumman Sys. Support Corp.*, 795 F.Supp. 501, 505 (D.Mass. 1992) (Skinner, J.), *aff'd*, 36 F.3d 1147 (1st Cir.1994). Here, there is no question but that the first criterion is met, as architectural drawings are subject to protection under the Copyright Act. *See supra* Part II.A.1. The key question is whether the second criterion is met regarding either state law claim; that is, whether the state law claims are functionally equivalent to the copyright claim. In making this determination, courts sometimes find it important that the state law claim comprises elements not required for liability under the Act. *E.g., Harper & Row, Publishers, Inc. v. Nation Enters.*, 723 F.2d 195, 200 (2d Cir.1983) ("[W]hen a state law violation is predicated upon an act incorporating elements beyond mere reproduction or the like, the rights involved are not equivalent and preemption will not occur."), *rev'd on other grounds*, 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). The critical ultimate question, however, is "whether the claimed state created right is qualitatively similar enough to the right protected by federal law to be termed 'equivalent' to, and thus preempted by, the federal law." *Data Gen.*, 795 F.Supp. at 505. Put another way, the Court should ask whether the state law right "is one that is infringed by the mere act of reproduction, performance, distribution, or display." 1 Nimmer & Nimmer, *supra*, § 1.01[B][1]. With these principles in mind, the Court turns to the state law claims upon which Danielson seeks relief.

### 1. Conversion

▇ With respect to the state law tort of conversion, the general rule is that "conversion . . . relate[s] to interference with tangible rather than intangible property, and hence, should be held to be immune from pre-emption." *Id.* § 1.01[B][1][*i*]; *accord Oddo v. Ries*, 743 F.2d 630, 635 (9th Cir.1984); *Data Gen.*, 795 F.Supp. at 505 (holding that a conversion claim based on unlawful physical possession by defendant of copies of plaintiff's software was not preempted by federal copyright law). In Massachusetts, conversion focuses on the wrongful possession of personal property of the owner, without the owner's consent. *See Data Gen.*, 795 F.Supp. at 505 (citing *Third National Bank v. Continental Insurance Co.*, 388 Mass. 240, 244, 446 N.E.2d 380 (1983); and Restatement (Second) of Torts § 222A).

It is not always true, however, that state law conversion claims survive preemption. "If . . . contrary to the usual view of conversion, it is regarded as encompassing unauthorized reproductions, then the rights created are indeed 'equivalent' to copyright, and the state law is pre-empted." 1 Nimmer & Nimmer, *supra*, § 1.01[B][1][*i*]; *accord Quincy Cablesystems, Inc. v. Sully's Bar, Inc.*, 650 F.Supp. 838, 848–50 (D.Mass.1986) (Caffrey, J.) (ruling plaintiff's conversion claim to be preempted because it was based on unlawful "distribution, performance and display" of the protected work). Whether a conversion claim is ultimately preempted depends on how the claim is pled, and on the facts that support the claim.

In this case, Danielson alleges that Winchester–Willows "asserted ownership and control over Danielson's drawings that was inconsistent with Danielson's ownership rights," Am.Compl. ¶ 96, and that Danielson "did not authorize [Winchester–Willows] or any other person to use its drawings," *id.* ¶ 97. Moreover, Danielson seeks relief in the form of an order that Winchester–Willows "return to Danielson all of the drawings made by or at [Winchester–

Willows's] direction" that infringe Danielson's rights. *Id.* at 22. Danielson thus appears to complain of Winchester–Willows's physical possession of the Claim Drawings, and to seek restoration of exclusive physical possession of the drawings to Danielson. While this claim might not be the centerpiece of Danielson's complaint, and it might not entitle Danielson to any significant relief apart from the copyright claim, those factors do not warrant a ruling that the conversion claim is preempted by the Copyright Act. Danielson may thus proceed with its state law conversion claim against Winchester–Willows.

### 2. Chapter 93A

■ Danielson's claim pursuant to Chapter 93A of the Massachusetts General Laws does not fare as well as its conversion claim. Danielson's complaint states as its basis for relief under Chapter 93A only that Winchester–Willows's "violations were knowing and willful," Am.Compl. ¶ 107, and that "[a]s a result of [Winchester–Willows's] unfair and deceptive acts and practices, [Winchester–Willows] have realized great economic benefit and Plaintiff has suffered great economic loss and damage," *id.* ¶ 108. While Danielson does not flesh out the basis for its 93A claim in its summary judgment papers, the likely reason for its inclusion of this claim in its complaint is that Chapter 93A allows Danielson to ask for treble damages and attorney's fees. *Id.* ¶ 109 (requesting such relief); Mass.Gen.Laws ch. 93A, §§ 9, 11 (authorizing such relief). This, without more, is not enough to allow Danielson's 93A claim to survive preemption. Although the Court offers no opinion on whether 93A claims may in certain instances survive preemption, the Court does hold that, on the facts of this case, Danielson has failed to offer any reason why its rights under Chapter 93A are not equivalent to its rights under the Copyright Act. Accordingly, the Court dismissed Count IV of Danielson's complaint, as it is preempted by the Copyright Act.

### III. Conclusion

For the foregoing reasons, the Court GRANTED Winchester–Willows's motion for summary judgment [Docket No. 19] as to Danielson's Chapter 93A claim, but DENIED it as to all other claims, and GRANTED Danielson's motion for summary judgment [Docket No. 25] as to its copyright infringement claim, but DENIED it as to all other claims in an order dated February 8, 2002 [Docket No. 56]. What remains to be tried are the following issues: (1) when Danielson's copyright infringement claim accrued for purposes of the statute of limitations; (2) damages with respect to the copyright infringement claim (assuming Danielson's claim did not accrue more than three years before it filed its complaint); (3) Danielson's Lanham Act claim; (4) Danielson's conversion claim.