# United States Court of Appeals
## For the First Circuit

Nos.   02-1452
       02-1533

JOHN G. DANIELSON, INC.

Plaintiff, Appellee, Cross-Appellant,

v.

WINCHESTER-CONANT PROPERTIES, INC.;
THE WILLOWS AT WINCHESTER, LLC,

Defendants, Appellants, Cross-Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, Chief U.S. District Judge]

Before

Lynch, Circuit Judge,
Stahl, Senior Circuit Judge,
and Howard, Circuit Judge.

Gary S. Matsko, with whom Paul L. Feldman, Judith
Ashton, and Davis, Malm & D'Agostine, P.C. were on brief for
appellants and cross-appellees

Anthony E. Battelle, with whom Construction Law
Services, Charles R. Heuer, and Heuer Law Group were on brief for
appellee and cross-appellant.

March 6, 2003

**LYNCH**, <u>**Circuit Judge**</u>.  This copyright case involves unusual facts, many dating to the mid-1980s, which greatly influence its result.  A real estate developer acquired a parcel of land covered by a 30-year restrictive covenant to which a previous owner had agreed.  The covenant required that any residential development conform with site plans submitted by the previous owner.  The new owner tried to modify these restrictions; when it failed to do so it built a condominium subdivision that adhered to the site plans in the covenant.  The architectural firm that had earlier designed those plans then sued for copyright infringement and unfair competition, and eventually won a jury verdict and a judgment in the district court for over $1.3 million -- essentially all the profits from the now-complete condominium project.

The corporation that built the condominiums, Winchester-Conant Properties, Inc. ("WCP"), appeals the dismissal of most of its affirmative defenses.  We affirm these dismissals, although in some instances our reasons for affirmance differ significantly from the district court's rationale.  The plaintiff architectural firm, John G. Danielson, Inc. ("Danielson") appeals some of the court's rulings dismissing its unfair competition claims.  We affirm these rulings as well.  Finally, both parties appeal aspects of the damages award.  WCP argues that the district court gave erroneous instructions to the jury concerning the apportionment of profits between the infringing design and other aspects of the development.

-2-

We agree, vacate the damage award, and remand for a determination of damages using the correct standards.

## I.  Background

A.  <u>Facts</u>

In the mid-1980s, Louis Farese was co-trustee of a trust that owned a 7.4 acre parcel of land in Winchester, Massachusetts (the "site").  Danielson had worked on other projects for Farese, and Farese hired Danielson to develop plans for the site. Danielson in turn retained Donald Tellalian, of Tellalian Associates Architects and Planners ("Tellalian Associates"), as a subcontractor to assist it in its work on Farese's project.

Danielson, Tellalian Associates, and Farese consulted with each other, Winchester town officials, and residents who lived near the site to determine the best course for developing the land. They settled on a condominium development, and showed some early drafts of their plans to these stakeholders, some of whom suggested various changes.  This process culminated in the production of seven drawings, dated June 11, 1987, depicting a 70-unit condominium development with four residential buildings and a "clubhouse" for community activities.

Four of these drawings are subjects of Danielson's infringement claims.  Three are site plans (labeled SP-1, SP-2, and SP-3) which show the layout of the site from a bird's eye view, including footprints of buildings, roads, parking, and green

-3-

spaces; they bear the logos of both Danielson and Tellalian Associates. The fourth is an unlabelled artist's rendering of the buildings (designated A-3). None of these drawings had a copyright notice on them.

At the time, the site was not zoned for residential development and was covered by a restrictive covenant between a previous owner and the Town of Winchester (the "Town"). The condominium plan could only be completed if both the zoning and the covenant were amended, and only the Winchester Town Meeting could approve either change. On June 11, 1987 -- the same date that is on the seven drawings -- the Winchester Planning Board voted to recommend that the Town Meeting amend the site's zoning to allow residential development. The Board also entered into a new restrictive covenant with Farese, subject to Town Meeting approval. This covenant would run with the land for 30 years, could be altered only by a two-thirds vote of the Town Meeting, and required that any residential development be in accordance with the seven drawings. (These drawings are therefore referred to by the litigants as the "covenant drawings.") At the Town Meeting on June 15, 1987, Tellalian showed several of the covenant drawings on an overhead projector as part of his presentation; some were also displayed on easels in the lobby. The Town Meeting followed the Board's recommendations and approved both the rezoning and the

replacement of the previous covenant with the restrictive covenant signed by Farese and his co-trustee.

Having cleared this obstacle, Farese and Danielson signed a written contract for the project on June 29, 1987. The document is a standard form contract furnished by the American Institute of Architects (AIA), with some modifications made by the parties. The contract specifies that all plans remain Danielson's property, that plans are not to be used on other projects or by other parties without Danielson's written consent, and that "[s]ubmission or distribution to meet official regulatory requirements . . . is not to be construed as publication in derogation of the Architect's rights."

As work continued, Danielson created numerous construction drawings; four of these, labeled C-1, C-3, C-4, and L-1, are also subjects of this litigation. These four drawings are marked with several revision dates in 1987 and 1988; they depict the site layout with some modifications and additions, particularly engineering details. They all bear logos of both Danielson and Tellalian Associates but lack copyright notice; two of them also include the logo of another Danielson subcontractor, Medford Engineering ("Medford").

Soon after construction began in 1988, Farese encountered serious financial difficulties. The project was abandoned and lay

dormant until 1994. Danielson has never collected over $226,000 that Farese owes it for work completed under the contract.

In 1993, Robert Pace became interested in buying and developing the site. He formed WCP and acquired the site in a foreclosure sale in April 1994.[1] Over the next few months, WCP considered a range of possible development options, including townhouses, single-family homes, and housing for the elderly. Several versions of a condominium plan like the one Farese had pursued were also "on the table." Representatives of WCP met three times in mid-1994 with Edmond Danielson, by then the only full-time architect at the Danielson firm, to discuss ideas for the site. At Edmond Danielson's suggestion, Donald Tellalian joined the second and third of these meetings. The WCP representatives brought the disputed drawings to these meetings and the participants looked at them, but WCP expressed concern that Farese's plan would not be profitable. WCP commissioned Danielson and Tellalian Associates to draft a proposed design for the elderly housing concept. By August 1994, WCP chose to pursue a townhouse plan designed by another architect instead.

---

[1] Pace later formed a subsidiary of WCP, The Willows at Winchester, LLC, and transferred ownership of the site to that entity, which Danielson also named as a defendant. In addition, the condominiums were marketed by WCP under the brand name of an affiliated company, Starter Sales. We refer to all of these entities collectively as "WCP."

WCP did not have the same luck as Farese in removing preexisting covenants, however. After failing in several attempts to persuade the Town to alter the covenant established with Farese, WCP decided in mid-1995 to develop the site according to the covenant specifications after all. WCP provided its architects and engineers (including some, like Medford, who had worked for Danielson on the earlier project) with construction drawings that are the subject of this lawsuit. These agents removed the Danielson and Tellalian Associates logos and produced plans very similar to the drawings Danielson claims were infringed. These copied drawings were in turn used to obtain permit approval from the town in December 1995. WCP included a simplified site plan in a sales brochure, and also placed a copy of the artist's rendering, covenant drawing A-3, on its signs. Construction began on the development, called "The Willows at Winchester," in 1996, and was finished in 2000.

The parties disagree about some aspects of their communication at this juncture, but clearly they stopped doing business together after the elderly housing design was rejected in August 1994. Sometime in late 1995 or early 1996, a representative of WCP telephoned Donald Tellalian and told him that the company now planned to use the site layout embodied in the covenant. Neither WCP nor Tellalian informed Danielson; WCP says it thought that Tellalian spoke for Danielson. In any event, Edmond Danielson

says he was unaware of WCP's intent to use the old design until August 1997, when one of the firm's former employees happened to drive past the site, noticed the buildings under construction, and informed him. Danielson swiftly contacted attorneys, who sent a letter to WCP stating Danielson's claim. Danielson also registered the covenant drawings and construction drawings for copyright in 1999. Finally, Danielson requested and received from Tellalian written statements indicating that Tellalian Associates made no claim on the copyright interests in the drawings.[2]

B. Procedural History

After settlement discussions yielded no fruit, Danielson filed a complaint in the U.S. District Court for the District of Massachusetts in May 2000. The suit asserted a claim of copyright infringement under 17 U.S.C. § 501 (2000). It also asserted three unfair competition claims: conversion under state law; false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a) (2000); and unfair and deceptive trade practices under Mass. Gen. Laws ch. 93A (2001).

The parties both submitted summary judgment motions. WCP sought dismissal of the case. Danielson sought summary judgment as to liability on three of its claims, but not as to the conversion claim or damages issues. On February 8, 2002, shortly before

---

[2] The authorship and ownership of copyright in the plans had been an issue at earlier stages in this litigation, but WCP foregoes these arguments on appeal.

-8-

trial, the district court issued an order disposing of these motions and shaping the case for trial. The district court later issued a published opinion elaborating on its numerous holdings. John G. Danielson, Inc. v. Winchester-Conant Props., Inc., 186 F. Supp. 2d 1 (D. Mass. 2002).

In these pretrial rulings, the court held that there was no genuine factual dispute that WCP had infringed Danielson's copyright. Id. at 4, 14. It dismissed five of WCP's affirmative defenses, which asserted that Danielson's copyright was invalid because of: (1) publication without statutorily required notice, (2) disclosure in the covenant which placed the plans in the public domain, (3) implied license, (4) merger doctrine, and (5) abandonment. Id. at 14-24. The court also ruled that Danielson's state-law unfair trade practices claim was preempted by federal copyright law. Id. at 29. The other motions were denied.

The trial lasted through six days of testimony from February 19-27, 2002. After plaintiff rested, WCP moved for directed verdict; the court granted the motion as to Danielson's conversion claim, but allowed the copyright and false designation of origin claims to go forward. At the close of all the evidence, the district court rejected renewed motions for directed verdict on these matters, but granted Danielson's motion for directed verdict against WCP's estoppel and waiver defenses.

Taken together, these rulings considerably narrowed the questions left for the jury to decide. Two issues often at the heart of copyright cases, copyrightability and infringement, were already determined as a matter of law. On the copyright claim, the jury considered only the two remaining affirmative defenses, concerning the statute of limitations and coauthorship. The jury found for Danielson on both of these defenses and neither of these verdicts is appealed. It awarded damages on the copyright claim of $1,464,950. The jury also found that Danielson's Lanham Act claim of false designation of origin was within the statute of limitations and that WCP was liable under that claim for $120,000 in damages. The jury's total damages award represented essentially all of the profit WCP made from the development.

The district court disposed of post-trial motions from the bench at a hearing on March 27, 2002. It denied WCP's motion for a new trial under Fed. R. Civ. P. 59. The court granted WCP's renewed motion for judgment as a matter of law under Fed. R. Civ. P. 59(b) as to the Lanham Act claim, however, because it held there was no basis in the evidence for the $120,000 in damages the jury had awarded. The court also reduced the damages under the copyright claim by $120,000, stating from the bench that it was "clear to the Court that the $120,000 was simply added onto the

base damages the plaintiff otherwise is entitled to."[3]  Finally, the court dealt with Danielson's petition for attorneys' fees, prejudgment interest, and costs.  Danielson was not entitled to attorneys' fees under the Copyright Act because the drawings were not registered at the time of infringement.  17 U.S.C. § 412. Because the Lanham Act verdict was vacated, the district court ruled that Danielson could not get attorneys' fees from that source either, but entered a provisional award of fees in case the Lanham Act dismissal were to be reversed on appeal.  Finally, the court denied prejudgment interest and awarded costs.  Judgment for Danielson was then entered in the amount of $1,344,950.  These cross-appeals followed.

WCP appeals the pretrial dismissal on summary judgment of four of its affirmative defenses, as well as the directed verdict against its estoppel and waiver defenses during trial.  WCP also pursues its objections to the jury instructions concerning the calculation of damages and to the exclusion of certain expert testimony concerning damages that it attempted to offer at trial. Finally, WCP appeals the denial of its motion for a new trial. Danielson appeals the dismissal of its unfair trade practices claim and its Lanham Act false designation of origin claim, as well as the denial of attorneys' fees and prejudgment interest.

---

[3]  As an alternative, in the event that the decision to reduce the jury's copyright damages award were later reversed, the district court also ordered a remittitur of the same amount.

## II.  Affirmative Defenses

Because copyrightability and infringement are not in serious dispute, WCP's only real hope to avoid liability lies in its affirmative defenses.  It does not appeal those affirmative defenses rejected by the jury, or its abandonment defense.  It does appeal four affirmative defenses dismissed on summary judgment.  We review such rulings de novo, including when summary judgment is granted, as here, on cross-motions.  Segrets, Inc. v. Gillman Knitwear Co., 207 F.3d 56, 61 (1st Cir. 2000).  In addition, WCP appeals the dismissal of its estoppel and waiver defenses during trial.  We review this grant of a motion for judgment as a matter of law under Rule 50(a) de novo, giving inferences to the nonmovant and affirming only if no reasonable jury could have found in the nonmovant's favor.  Espada v. Lugo, 312 F.3d 1, 2 (1st Cir. 2002).

## A.  Publication

WCP first argues that Danielson's handling of the covenant drawings during efforts to secure the zoning change in 1987 constituted their "publication," a term of art under copyright law.  WCP argues that, because copyright law at that time required notice to accompany publication, and the drawings lacked notice, Danielson forfeited any copyright it had.

We emphasize at the outset that the relevant events, which occurred in 1987, fall within a short period between two major revisions of applicable federal copyright law.  The Copyright

Act of 1976, Pub. L. No. 94-553, 90 Stat. 2541 ("1976 Act"), which became effective on January 1, 1978, included a statutory definition of publication for the first time.[4]  See 17 U.S.C. § 101.  The Berne Convention Implementation Act, Pub. L. No. 100-568, 102 Stat. 2853 (1988) ("Berne Act"), which became effective on March 1, 1989, made notice optional rather than mandatory, while retaining incentives to encourage notice.  See 17 U.S.C. § 401. The overlap of the 1976 Act's publication definition (which remains in force today) and mandatory notice (now optional) lasted only for the period between these enactments.  If the same facts arose today, they would not present a significant issue.[5]

The law in 1987 required that, when works were published, they include formal notice or lose their copyright.  See 17 U.S.C. § 401(a) (1982) (amended 1988) ("[A] notice of copyright shall be placed on all publicly distributed copies").  Sufficient notice required three elements:  a declaration of copyright such as the

---

[4]    The 1976 Act also reduced the importance of publication. Previously, the publication of a work had marked the point at which its federal copyright protection began, but after the 1976 Act, federal copyright attached at the moment a work was first created. See 17 U.S.C. § 301(a) (setting preemption at point when work is "fixed in a tangible medium").  Copyright attached to the drawings at issue here when they were first drafted -- in the parlance of copyright, when they were first "fixed" on paper.  See id. at § 101.

[5]    This case is also not covered by the Architectural Works Copyright Protection Act of 1990, because the drawings were created before the statute's effective date.  See Pub. L. No. 101-650, § 706, 104 Stat. 5089, 5134 (1990).

"©" symbol, the year of publication, and an identification of the copyright holder. Id. at § 401(b). It is undisputed that the drawings at issue here did not satisfy these requirements. Although the 1976 Act added some provisions to cure or disregard the omission of notice at the time of publication, see id. at §§ 405-406, it is also undisputed that none of them applies to this case. See generally Donald Frederick Evans & Assocs. v. Cont'l Homes, Inc., 785 F.2d 897, 905-12 (11th Cir. 1986) (analyzing curative provisions from 1976 Act). Congress recognized in 1976 that the penalties for publishing without notice might be unduly harsh. See H.R. Rep. No. 94-1476, at 143-44 (1976) [hereinafter "House Report"] ("One of the strongest arguments for revision of the present statute has been the need to avoid the arbitrary and unjust forfeitures now resulting from unintentional or relatively unimportant omissions or errors in the copyright notice."). But it was not until passage of the Berne Act that this requirement was eliminated.

Because it is clear that the drawings did not satisfy the applicable notice requirements, WCP's argument depends on whether there was a "publication" of the drawings so that notice was mandated. The statutory definition of publication reads in full:

> "Publication" is the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes

-14-

publication. A public performance or display of a work does not of itself constitute publication.

17 U.S.C. § 101.

WCP points to several uses of the covenant drawings to support its argument that they were published under this definition. The drawings were shown to neighborhood groups and town officials during the planning process. At the Town Meeting, they were displayed on easels and projected onto a screen. The Town Meeting was videotaped, and the tape was broadcast on local cable television and placed in the Winchester Public Library. The plans were filed with the Town as exhibits to the covenant, and could be copied from those files by anyone. In addition, some drawings were later shared with Danielson's subcontractors.

The district court granted summary judgment against this defense by relying on an aspect of the doctrine of "limited publication." See Danielson, 186 F. Supp. 2d at 15-18. The statutory definition of publication quoted above "in general constitutes a codification of the definition evolved by case law" before the 1976 Act. 1 M.B. Nimmer & D. Nimmer, Nimmer on Copyright § 4.04, at 4-20 (2001) [hereinafter "Nimmer"]. That case law includes judicially crafted exceptions for limited publication: restricted distribution of the work that does not qualify as publication or trigger the notice requirement. Limited publication "occurs when tangible copies of the work are distributed, but to a limited class of persons and for a limited purpose." Burke v. NBC,

598 F.2d 688, 692 (1st Cir. 1979) (explaining and applying law before 1976 Act) (citing White v. Kimmel, 193 F.2d 744, 746-47 (9th Cir. 1952)).

Numerous cases have applied the limited publication exception to the submission of architectural plans to municipal authorities for approval, either because the law required this submission for a limited purpose or because doing so did not constitute a distribution. See, e.g., Codespoti & Assocs. v. Bartlett, 51 F. Supp. 2d 125, 128 (D. Conn. 1999); East/West Venture v. Wurmfeld Assocs., 722 F. Supp. 1064, 1066 (S.D.N.Y. 1989); Edgar H. Wood Assocs. v. Skene, 197 N.E.2d 886, 893-94 (Mass. 1964) (common-law copyright); see also 1 Nimmer, supra, § 4.10, at 4-52 (under 1976 Act, "placing a work in a public file . . . clearly does not constitute an act of publication"). But see Certified Eng'g, Inc. v. First Fid. Bank, 849 F. Supp. 318, 323-24 (D.N.J. 1994) (drawings for subdivision published by submission to authorities, but holding made in context of denying preliminary injunction). Similarly, the circulation of plans to contractors for purposes of working on the project has been found a limited publication. See, e.g., Kunycia v. Melville Realty Co., 755 F. Supp. 566, 574 (S.D.N.Y. 1990).

At least some of the activities that WCP characterizes as publication are covered by these limited publication exceptions. For example, once the covenant was approved and submitted to the

-16-

Town, state law required that the drawings be available as public records.  See Mass. Gen. Laws ch. 66, § 10(a) (2001); Hull Mun. Lighting Plant v. Mass. Mun. Wholesale Elec. Co., 609 N.E.2d 460, 463-64 (Mass. 1993) (broad definition of public records subject to disclosure).  The exception also covers copies provided to Danielson's subcontractors or consultants, including Medford, for work on the project.

Nonetheless, other activities went beyond such limited groups and limited purposes.  The neighborhood meetings and the Town Meeting were open to the general public, and the broadcast and videotape of the Town Meeting could also be viewed by a broad group of people.

The district court responded to this problem by erroneously extending the boundaries of the exception.  It pointed out that this access to the plans was "helpful" in obtaining approval of the zoning change, Danielson, 186 F. Supp. 2d at 16 n.2, and "in furtherance of the Town's obligation under state law to solicit input from the community and make findings regarding the desirability" of the project, id. at 17.  However, the cases cited by the court concerned putative publications that were required by law or were otherwise made for narrow purposes.  Extending the exception to everything that is "helpful" in lobbying for municipal approval of a zoning change, including dissemination to the general public, effectively removes the "limited" from limited publication.

Nevertheless, this court may affirm a district court's grant of summary judgment on any basis that is manifest in the record. See Burns v. State Police Ass'n, 230 F.3d 8, 9 (1st Cir. 2000). Here, the district court's expansion of the limited publication doctrine was unnecessary to its result, because the record indicates that the remaining alleged publications were not covered by the statutory definition. Rather, Danielson merely "displayed" the drawings within the meaning of the Act. The Copyright Act states outright, "A public performance or display of a work does not of itself constitute publication." 17 U.S.C. § 101.

WCP's own submission of undisputed facts in support of summary judgment demonstrates that the uses of the drawings at the neighborhood meeting and the Town Meeting do not qualify as publications:

> In 1986 and early 1987, the Covenant Drawings and earlier versions thereof were <u>shown</u> to many individuals and groups by Danielson and Tellalian. They were <u>shown</u> to neighbors of the Site at several neighborhood meetings at which representatives of Tellalian and/or Danielson were present. They were <u>shown</u> to Farese as well. . . .
>
> Numerous meetings were also held with the Town of Winchester Planning Board by representatives of Farese, Danielson, and Tellalian. Copies of the Covenant Drawings and earlier versions thereof were <u>shown</u> to Planning Board members. . . .
>
> Four of the seven Covenant Drawings were <u>shown</u> to all present [at the Town Meeting] on a large screen placed at the front of [the] meeting by D. Tellalian. . . . [The] drawings were also all placed in public <u>view</u> on easels in the lobby of the building.

-18-

(Emphasis added).  In addition, one of Danielson's architects said at his deposition that the plans were only shown, not distributed. When asked whether those in attendance at neighborhood meetings could have copied the drawings they were shown, he replied "No. . . . They were in our possession.  They would have to have permission to copy them."

At most, Danielson or Tellalian "showed" plans to others; that did not constitute publication under the explicit terms of the statute.  "[A] sine qua non of publication should be the acquisition by members of the public of a possessory interest in tangible copies of the work in question."  1 Nimmer, supra, § 4.07, at 4-42.

The broadcast of the Town Meeting on local cable television does not constitute publication under the definition in the 1976 Act either.  The definition "makes plain that any form [of] dissemination in which a material object does not change hands -- performances or displays on television, for example -- is not a publication no matter how many people are exposed to the work." House Report at 138; see Burke, 598 F.2d at 693 ("Publication did not occur merely because the film was shown [on television] to the general public."); 1 P. Goldstein, Copyright § 3.3, at 3:31 (2d ed. 1996) (mere broadcast probably not publication, even if home videotaping would be possible).

That leaves the fact that the public library held a videotape of the meeting that patrons could borrow. After viewing a copy of this video provided by WCP, we are not confident that the often unfocused image of a blurry projection on a screen in the high school auditorium actually qualifies as a publication of the covenant drawings themselves. We put that factual question to one side, however, because of the absence of any evidence that Danielson or Tellalian knew that the tape of the Town Meeting would be loaned at the library, rather than merely broadcast on local cable television. Publication requires the consent of the copyright owner. See 1 Nimmer, supra, § 4.04, at 4-20 to 4-21 & n.8; Goldstein, supra, § 3.3.1, at 3:33 & nn. 19-20. While this condition is implicit in the publication definition, it is reiterated explicitly in the notice requirement. See 17 U.S.C. § 401(a) (requiring notice on works published "by authority of the copyright owner"). Unlike the other actions alleged to be publication, WCP has not shown that this one was authorized by Danielson.

On appeal, WCP also argues that the requirements of the definition of "publication" are fulfilled because it includes the "offering to distribute copies . . . to a group of persons for purposes of . . . public display." 17 U.S.C. § 101. According to this argument, Danielson offered the covenant drawings to Farese and his associates, and they in turn displayed them. The facts in

-20-

the record do not support this interpretation either. Only architects working for Danielson or for Tellalian Associates displayed the plans; there is no indication that Farese or his agents did so instead. Indeed, WCP's summary judgment submission noted the plans were "shown to Farese," suggesting he may not even have possessed copies of them until later.

Congress has provided the courts with an explicit definition of publication in the 1976 Act that seeks to prevent much of the litigation and confusion that had previously surrounded the undefined term. The facts here allow us to apply that definition without venturing to create any new doctrine about the murky boundaries of limited publication.

B. Covenant Drawings as "Laws"

WCP next argues that the covenant drawings, by virtue of their inclusion in the restrictive covenant approved at the Town Meeting, have become "laws" which are in the public domain and uncopyrightable.

It is well-established that judicial decisions and statutes are in the public domain. Bldg. Officials & Code Admin. Int'l, Inc. v. Code Tech., Inc. ("BOCA"), 628 F.2d 730, 733-34 (1st Cir. 1980) (reviewing case law); see Banks v. Manchester, 128 U.S. 244 (1888) (judicial opinions are in public domain); Wheaton v. Peters, 33 U.S. 591 (1834) (judicial opinions are not copyrightable). This straightforward general rule has proven

-21-

difficult to apply when the material in question does not fall neatly into the categories of statutes or judicial opinions. A number of appellate courts have reached arguably inconsistent results in such cases. See Veeck v. S. Bldg. Code Cong. Int'l, Inc., 293 F.3d 791, 793 (5th Cir. 2002) (en banc) (model code enters public domain when legislatively adopted as law of a jurisdiction), petition for cert. filed, Sept. 4, 2002 (No. 02-355); Practice Mgmt. Info. Corp. v. Am. Med. Ass'n, 121 F.3d 516, 518-20 (9th Cir. 1997) (incorporation of classification system for medical procedures in Medicare and Medicaid regulations does not make them uncopyrightable); CCC Info. Servs., Inc. v. Maclean Hunter Mkt. Reports, Inc., 44 F.3d 61, 73-74 (2d Cir. 1994) (incorporation of used-car valuations in insurance statutes and regulations does not make them uncopyrightable).

The First Circuit faced such a question when it vacated a preliminary injunction against printing state regulations; the regulations incorporated material written by a private party, which was purportedly copyrighted and licensed to the state. BOCA, 628 F.2d at 736. While the court leaned strongly toward a conclusion that the copyright was invalid, it emphasized just as strongly that it declined to reach a definitive conclusion. Id. BOCA did not resolve the issue and this court has not done so since.

WCP cites BOCA and urges us to adopt the rule suggested there and apply it to the covenant drawings. The district court,

-22-

after noting that BOCA was not binding on it, <u>Danielson</u>, 186 F. Supp. 2d at 21, adopted the opposite rule. <u>Id.</u> at 23 ("[O]therwise copyrightable works . . . do not lose copyright protection when they are adopted by government bodies or incorporated by reference into public enactments."). We reject both courses of action. We do not need to consider the broad question we reserved in <u>BOCA</u>, because the facts here do not present it.

The restrictive covenant is distinct from the zoning law. The Town Meeting debated and voted on two different measures concerning the site, which had two different effects. The first vote changed the zoning law so that the site was zoned for residential development. We need not consider here whether or not the zoning law is within the public domain, such that any potential intellectual property rights to its content would be overridden, because that law simply sets parameters for the development permissible in different zones, and designates the site as belonging to a particular zone. <u>See generally</u> 18A D.A. Randall & D.E. Franklin, <u>Massachusetts Practice: Municipal Law & Practice</u>, chs. 17-18 (4th ed. 1993).

The second vote at the Town Meeting approved the restrictive covenant, which is nothing more than an agreement between the Town of Winchester and Farese (and his successors in ownership) concerning the site. A restrictive covenant is "[a] <u>private</u> agreement, usu[ally] in a deed or lease, that restricts the

use or occupancy of real property." Black's Law Dictionary 371 (7th ed. 1999) (emphasis added); see Randall & Franklin, supra, § 570, at 18 (change in overall zoning law does not remove conditions of covenant recorded in deed for particular land). The restrictive covenant in this case displays the hallmarks of a private contract. It notes consideration given to Farese and his co-trustee by the Town and includes notarized signatures of both the trustees and Town officials. It is this document which incorporates, by reference, the seven drawings that Danielson provided to Farese.

Farese could just as easily have entered into an agreement with the site's neighbors to limit development; its embodiment in a restrictive covenant, recorded as part of the deed, would not convert such a private contract or easement into a "law" and thrust it into the public domain. It would not bind the public at large, but only the parties and their successors in interest. The fact that the Town was a party to the restrictive covenant here does not change the analysis.

WCP argues that the Planning Board and Town Meeting changed the zoning only because they knew the covenant would be enforced, and that adoption of the two "in tandem" makes them part of the same "legislative scheme." The logical extension of this argument, however, is that any undertakings on which lawmakers rely in passing a statute would become part of the "legislative scheme" and the public domain. If Farese and the neighbors had entered

-24-

into a private covenant, and the Planning Board and Town Meeting changed the zoning only because they knew of this contract and it satisfied their concerns about the site, there would be no argument that the covenant was thereby part of the public domain. Similarly, references to the covenant drawings or their features in the Planning Board's decision and speeches at the Town Meeting do not thrust the drawings themselves into the public domain, any more than quoting a poem on the Senate floor would strip the poet's copyright.

There are compelling arguments on both sides of the question we reserved in BOCA. They implicate the proper scope of the public domain and the best means to encourage private involvement and expertise in lawmaking. But contracts entered into by government entities do not raise these weighty issues, and we need not resolve the question we left open in BOCA in order to rule on this case. Because the covenant drawings were not incorporated into any generally applicable laws, we affirm the district court's grant of summary judgment against this defense.

C. Implied License

Usually transfers of copyright must be made in writing, 17 U.S.C. § 204(a), but this requirement does not apply to nonexclusive licenses where ownership of the copyright is not transferred, see id. at § 101. A copyright owner may grant such nonexclusive licenses orally, or they may be implied from conduct

which indicates the owner's intent to allow a licensee to use the work.  See Data Gen. Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147, 1167 n.35 (1st Cir. 1994); 3 Nimmer, supra, § 10.03(A)(7), at 10-42.  Uses of the copyrighted work that stay within the scope of a nonexclusive license are immunized from infringement suits.  See Graham v. James, 144 F.3d 229, 236 (2d Cir. 1998).

The burden of proving the existence of such a license is on the party claiming its protection, the licensee.  Bourne v. Walt Disney Co., 68 F.3d 621, 631 (2d Cir. 1995).  Implied licenses are found only in narrow circumstances.  See SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc., 211 F.3d 21, 25 (2d Cir. 2000) (citing Effects Assocs., Inc. v. Cohen, 908 F.2d 555, 558 (9th Cir. 1990)).  WCP argues that it has met this burden and shown that Danielson granted a nonexclusive license to future owners of the site to use the disputed drawings.  It did so, argues WCP, by permitting the incorporation of the covenant drawings in a restrictive covenant running with the land.

At least four other circuits have resolved cases in which an architect sued for copyright infringement and the defendant answered that it had a nonexclusive license to use the architect's plans.  See Nelson-Salabes, Inc. v. Morningside Dev., LLC, 284 F.3d 505, 514-16 (4th Cir. 2002); Foad Consulting Group v. Musil Govan Azzalino, 270 F.3d 821, 828-32 (9th Cir. 2001); Johnson v. Jones, 149 F.3d 494, 500-02 (6th Cir. 1998); I.A.E., Inc. v. Shaver, 74

-26-

F.3d 768, 775-76 (7th Cir. 1996).  These cases reached different results on their individual facts:  Foad Consulting and I.A.E. found licenses while Nelson-Salabes and Johnson did not.  But they all applied a similar analytical framework, and we will follow their lead.

The touchstone for finding an implied license, according to this framework, is intent.  See Nelson-Salabes, 284 F.3d at 515 (calling intent "determinative question"); Johnson, 149 F.3d at 502 ("Without intent, there can be no implied license."); see also Data Gen., 36 F.3d at 1167 n.35 (license is found from copyright owner's grant of "permission to use").  Two of the cases begin their analysis with a three-part test originally derived from Effects Associates, 908 F.2d at 558-59, which requires that the licensee request the creation of the work, the licensor create and deliver the work, and the licensor intend that the licensee distribute the work.  See Nelson-Salabes, 284 F.3d at 514-15; I.A.E., 74 F.3d at 776.[6]  But they quickly pass over the "request" and "delivery" issues to focus on manifestations of the architects' intent that plans may be used on a project without their involvement.  See

---

[6]  Foad Consulting bases its very similar framework on principles of California contract law, because it holds that state law governed the interpretation of the contract there.  270 F.3d at 826-28.  The author of Effects Associates, writing separately, criticizes this rationale.  Id. at 832-34 (Kozinski, J., concurring).  The circumstances of that case are different from the one at hand, and we need not delve into this aspect of the analysis.

Nelson-Salabes, 284 F.3d at 515; Johnson, 149 F.3d at 501; I.A.E., 74 F.3d at 776. We will do the same here, while noting that it was actually Farese, not WCP, who requested the work and received delivery of it.

The most recent of the four cases distilled its predecessors to yield this succinct summary:

> Our analysis of these decisions . . . suggests that the existence of an implied nonexclusive license in a particular situation turns on at least three factors: (1) whether the parties were engaged in a short-term discrete transaction as opposed to an ongoing relationship; (2) whether the creator utilized written contracts, such as the standard AIA contract, providing that copyrighted materials could only be used with the creator's future involvement or express permission; and (3) whether the creator's conduct during the creation or delivery of the copyrighted material indicated that use of the material without the creator's involvement or consent was permissible.

Nelson-Salabes, 284 F.3d at 516. This is not an exhaustive list of factors to consider, but it provides useful guidance in determining the crucial question of intent.

Here, the first two considerations point away from a license, because they both suggest Danielson's intent to remain involved in the job. Danielson was in a long-term relationship with Farese working on development of the site, not a one-time arrangement, unlike the architects in I.A.E. and Foad Consulting. See Nelson-Salabes, 284 F.3d at 516 (comparing cases). This intent was also manifested by the standard AIA contract signed by Farese and Danielson, which specifically provided that plans "shall not be

-28-

used . . . for other projects, for additions to this Project, or for completion of this Project by others . . . except by agreement in writing and with appropriate compensation." See Nelson-Salabes, 284 F.3d at 516 (architect asked client to sign AIA contract); Johnson, 149 F.3d at 500 (same). While this contract was signed after the date on the covenant drawings, Danielson says that the contract retroactively included the work done on those drawings as part of its schematic design phase.[7] In any event, we are looking to the contract for evidence about overall intent, not for an interpretation of its binding terms -- WCP was not a party to the contract. See Foad Consulting, 270 F.3d at 834 (Kozinski, J., concurring) (noting that contract can be evidence of a relationship giving rise to implied copyright license, even if the license is not derived from the contract itself); Johnson, 149 F.3d at 500 (using unsigned contract as evidence of intent). That evidence strongly suggests that Danielson granted no permission to others to use the plans.

To evaluate the third, more general consideration, these cases also look to whether the supposed infringer obtained the plans directly from the supposed licensor, which would suggest

_____

[7]     Farese had previously paid Danielson for services rendered through June 5, 1987. Activity from that date until July 3, including completion of the covenant drawings on June 11, was billed in the first invoice under the contract, dated July 15, 1987. The contract describes the schematic design phase, which amounted to 15 percent of the contract price, as including site plans like the covenant drawings.

permission to use them.  See, e.g., Johnson, 149 F.3d at 501; I.A.E., 74 F.3d at 777.  WCP got its copies of the plans from the foreclosure sale and from Medford, not from Danielson.  See Danielson, 186 F. Supp. 2d at 20.

Danielson's acquiescence to the use of its plans as the basis for the covenant may indeed point in the other direction, as WCP argues.  It could be seen as evidence that others were allowed to use the plans, although it is also possible that Danielson never contemplated the risk that Farese would fail to complete the development himself.  Whatever its import, we do not think this one fact outweighs all the other indications that no implied license was intended.  See Nelson-Salabes, 284 F.3d at 516 (weighing factors pointing in both directions and concluding that no license was granted).  Furthermore, giving undue weight to the filing of plans with the local government could vitiate our earlier holding, and the majority position among courts, that such filing alone does not undermine the copyright.

WCP also argues that intent of the grantor is the wrong standard for determining the existence of an implied nonexclusive license.  This argument misunderstands the intent benchmark as a subjective inquiry into the mind of the putative licensor.  Rather, it is an objective inquiry into facts that manifest such contractual intent.  See I.A.E., 74 F.3d at 777 (Relevant intent "is not the parties' subjective intent but their outward

manifestation of it"). This is a typical task in contract law. See, e.g., 1 E.A. Farnsworth, Farnsworth on Contracts § 3.13 (2d ed. 1998) (inferring contractual acceptance from conduct); id. at § 8.5 (inferring waiver of condition from conduct). If an architect worked on a short-term assignment with no outward signs of expecting to continue involvement with the larger project, and handed over the requested plans to a client without a contract or other limitations, it would not matter if he or she harbored private hopes of working on the next phase of the project. See I.A.E., 74 F.3d at 777. But that is not what happened here.

Finally, WCP's suggestion that the appropriate standard is the effect of the architect's behavior on the subjective perception of the supposed licensee has no basis. It conflates the affirmative defense of implied license with the affirmative defense of estoppel, which we consider below. And the argument that our refusal to find a license would restrain alienation is misplaced; it is the covenant itself, not Danielson's copyright, that encumbered the site, and WCP does not challenge the validity of the covenant.

D. Merger

It is axiomatic that, while "[n]o author may copyright his ideas or the facts he narrates," an author may copyright the expression of those ideas. Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 556 (1985); see 17 U.S.C. § 102(b).

-31-

Sometimes, however, an idea can be expressed in so few ways that it "merges" with its expression, and the expression become uncopyrightable.

> When the uncopyrightable subject matter is very narrow, so that the topic necessarily requires, if not only one form of expression, at best only a limited number . . . the subject matter would be appropriated by permitting the copyrighting of its expression. We cannot recognize copyright as a game of chess in which the public can be checkmated.

Morrissey v. Procter & Gamble Co., 379 F.2d 675, 678-79 (1st Cir. 1967) (internal quotations and citations omitted); see Concrete Mach. Co. v. Classic Lawn Ornaments Inc., 843 F.2d 600, 606-07 (1st Cir. 1988). For example, we have held that this doctrine of merger foreclosed copyright on rules for a sweepstakes contest which could be effectively communicated using only a limited number of verbal formulations, Morrissey, 379 F.2d at 679, and on pictures of fruits and flowers used on labels to indicate the scent of candles, Yankee Candle Co. v. Bridgewater Candle Co., 259 F.3d 25, 35 (1st Cir. 2001).

WCP argues that the restrictive covenant means there is only one way to build on the land, and that the covenant drawings merge with that idea. This contention distorts the purpose of the merger doctrine. The doctrine aims to prevent the monopolization of facts or ideas that are present in nature; where ownership of the expression would remove such facts or ideas from the public domain, the doctrine disallows copyright. See Yankee Candle, 259

-32-

F.3d at 36 ("In general, the merger doctrine is most applicable where the idea and the expression are of items found in nature, or are found commonly in everyday life."). Here, the restrictive covenant made one method of developing the site legally easier and cheaper than others, but it did not transform the covenant drawings into the only physically possible means to express ideas for such development. WCP's pursuit of several alternative designs demonstrates the availability of alternatives here -- as does an expert report proffered by WCP on damages issues, wherein WCP's expert says an appropriate layout for the site "can be achieved in many different ways."

WCP relies on Kern River Gas Transmission Co. v. Coastal Corp., 899 F.2d 1458 (5th Cir 1990), to support its position. In that case, regulators had given environmental approval to a proposed 1,000 mile route for a gas pipeline. The company that had plotted the route claimed copyright over documents depicting it; these were merely publicly available maps on which the company had added a line tracing the route. The court denied copyright protection based on merger. In WCP's view, Kern River based its merger finding on the fact that regulatory approval limited the available options for building a pipeline, and the map merged with the "idea" of an approved route. If that were the only reasoning in the case, we are not sure the decision would be correct. However, we think the regulatory approval was, at most, a secondary

consideration; merger applied, more simply, because the map markings were "the only effective way to convey the idea of the proposed location of a pipeline." Id. at 1464. Even if there had been no regulatory decision in the case, it should have come out the same way, because the underlying idea was no more than a linked series of geographical points found in nature, and a line on a map the only practical method to express that idea. The covenant drawings, in contrast, express just one of many possible detailed and complex visions for developing the site. Kern River is inapposite.

E.  Estoppel and Waiver

WCP argues that Danielson is estopped from an infringement action because it participated in the three 1994 meetings where WCP displayed some of the drawings and indicated that it might pursue a similar plan for the site. Principles of equitable estoppel from other areas of the law apply to copyright actions. See Hampton v. Paramount Pictures Corp., 279 F.2d 100, 104 (9th Cir. 1960); Cherry River Music Co. v. Simitar Entm't, Inc., 38 F. Supp. 2d 310, 318 (S.D.N.Y. 1999). The district court granted judgment as a matter of law against this affirmative defense at the close of evidence at the trial, because it found the evidence insufficient to give the issue to the jury.

The first element required to show estoppel is that the plaintiff knew of the defendant's potential infringement. See

<u>Plumley</u> v. <u>S. Container, Inc.</u>, 303 F.3d 364, 374 (1st Cir. 2002) (party to be estopped must "know the facts"); <u>Hampton</u>, 279 F.2d at 104 (same, applied to copyright). Danielson argues that the meetings established only that WCP possessed copies of the plans and considered possibly using them. WCP appeared more enthusiastic about other alternatives, however, and pursued them for a year. Indeed, a WCP employee who attended the meetings testified at trial that WCP expressed serious reservations about the economic viability of the condominium concept, given the changes in the market in the seven years since Farese had suspended construction. Moreover, there was no indication at these exploratory meetings that WCP would proceed with the Farese plan without Danielson's participation. When WCP reversed course and began working from the disputed drawings, it informed Tellalian of this fact, but never Danielson. In August 1997, when Danielson learned of actual infringement, it acted promptly to assert its claim.

We agree with the district court that the evidence about these meetings did not establish the type of knowledge necessary to estop Danielson from pursuing its claim. We also note that this conclusion is consistent with the jury's subsequent verdict on the statute of limitations defense, which necessarily involved a rejection of the claim that Danielson knew or should have known of infringing activity before May 1997. <u>Cf.</u> <u>Heinrich</u> v. <u>Sweet</u>, 308 F.3d 48, 69 (1st Cir. 2002) (looking to necessary implications of

-35-

jury verdict on one issue as support for conclusions on a different but related issue).

WCP advances an arguably distinct waiver defense based on the same arguments. A waiver must be voluntary and knowing, however. See Med. Air Tech. Corp. v. Marwan Inv., Inc., 303 F.3d 11, 19 & n.4 (1st Cir. 2002). Since the facts do not support knowledge sufficient for estoppel, waiver is a fortiori unsupportable.

### III. Unfair Competition Claims

Danielson appeals the summary judgment ruling against its claim of unfair and deceptive trade practices under Mass. Gen. Laws ch. 93A, and the post-trial judgment as a matter of law against it on the Lanham Act false designation of origin claim.

### A. Preemption of Chapter 93A Claim

Federal copyright law preempts rights under state law when they are the equivalent of those granted under the Copyright Act. 17 U.S.C. § 301(a). The district court granted summary judgment against Danielson's chapter 93A claim, finding it preempted by this provision. Danielson, 186 F. Supp. 2d at 29. As noted earlier, we review summary judgment de novo. See Segrets, 207 F.3d at 61.

WCP first invoked preemption as an affirmative defense in its answer to Danielson's complaint. Danielson essentially conceded in its briefs to us that it advanced only cursory legal

arguments against preemption at the time of summary judgment.  The behavior on which Danielson based its state-law claim is the same behavior that Danielson alleged gave rise to copyright liability.  The state claim is therefore preempted.  See Data Gen., 36 F.3d at 1164-65.[8]

B.  Lanham Act

The district court ruled post-verdict against Danielson's Lanham Act false designation of origin claim because the damages found by the jury when it found liability on the claim were too speculative.  On appeal, Danielson argues that the removal of its logo from the infringed drawings violated the Lanham Act, and that its contract with Farese provided a basis for the jury to reach the $120,000 figure.  In response, WCP argues not only that the amount of damages was unproven, but that Danielson failed to demonstrate any cognizable harm at all.  It also argues that other showings

---

[8]    Danielson attempts to augment its arguments on appeal by alleging that the element of "rascality" in a chapter 93A claim adds enough to escape preemption.  Normally, we will not entertain an argument on appeal of summary judgment that was not raised before the district court.  See Ortiz v. Gaston County Dyeing Mach. Co., 277 F.3d 594, 597 (1st Cir. 2002).  In any event, a label such as "rascality" is a dubious basis for the extra element required to survive preemption.  See Data Gen., 36 F.3d at 1165 (citing Mayer v. Josiah Wedgwood & Sons, Ltd., 601 F. Supp. 1523, 1535 (S.D.N.Y. 1985)).

required by the Lanham Act were inadequate, including the involvement of interstate commerce.[9]

Section 43(a) of the Lanham Act creates a federal cause of action for any person "who believes that he or she is likely to be damaged" by "any false designation of origin" used "in commerce" which "is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1125(a) (2000). A typical scenario involves "passing off," where a defendant sells its own goods or services while falsely representing that they come from the plaintiff; this claim is a "close cousin" of other trademark infringement actions, except that it is available to those with unregistered marks. See PHC, Inc. v. Pioneer Healthcare, Inc., 75 F.3d 75, 78 (1st Cir. 1996). Danielson's claim is closer to so-called "reverse passing off," where the defendant falsely attributes the plaintiff's product to itself or a third party. See Waldman Publ'g Corp. v. Landoll, Inc., 43 F.3d 775, 780-81 (2d Cir. 1994). The First Circuit has not recognized this claim under section 43(a) of the Lanham Act, although other courts have done so. See, e.g., id.; Smith v. Montoro, 648 F.2d 602, 605-07 (9th Cir. 1981). See

_____

[9] Danielson argues that WCP has waived these arguments by failing to discuss them in its opening brief to us. But these are cross-appeals, and WCP was the prevailing party on the Lanham Act issue before the district court. The onus is not on WCP to seek to have its victory re-examined on the grounds that the district court awarded it on too narrow a basis. Rather Danielson, in its capacity as cross-appellant, challenged the district court ruling. WCP then replied, having attacked the Lanham Act claim under Rule 50 both during and after trial.

generally J.T. Cross, Giving Credit Where Credit is Due, 72 Wash. L. Rev. 709, 716-19 & n.46 (1997) (collecting cases and tracing history); id. at 736-42 (criticizing recognition of reverse passing off claims under section 43(a)). We will not decide here whether we recognize such a claim, but will assume for purposes of this appeal that we would do so.

Danielson's arguments on the Lanham Act before the district court, and indeed the jury, were frequently cursory. At summary judgment, the district court said that it would refrain from entering judgment on the Lanham Act claim because "the parties have not adequately briefed the issue, and ought [to] be given an opportunity further to hone their arguments at trial." Danielson, 186 F. Supp. 2d at 27. But Danielson did little honing at trial; for example, it did not mention the claim in its closing argument to the jury (although WCP did).

For the most part, the argument that was made suggested that Danielson had been damaged by the alleged Lanham Act violation because it lost the contract value of the drawings as a result. But there is an insuperable causation problem with that argument. Danielson has insisted in other contexts that the only possible use for the infringed drawings was in connection with the site. Surely the reason that WCP did not hire Danielson for the job, or buy out the Farese contract, was not that it was deceived by the misattribution. We do not see how the miscreant and the only

potential lost customer can be one and the same; WCP would need to have confused itself.  False designation of origin did not cause this harm.

Danielson notes that others who came in contact with the drawings would have been misled about its origins as well.  Since exposure to subcontractors, planning officials, and the like would be good for business, one might expect that Danielson lost an opportunity to enhance its professional reputation.  See Johnson, 149 F.3d at 502 (reverse passing off found where defendant replaced plaintiff's logo with its own on architectural drawings and circulated them), quoted in Danielson, 186 F. Supp. 2d at 27; cf. Attia v. Soc'y of N.Y. Hosp., 201 F.3d 50, 58-60 (2d Cir. 1999) (considering similar claim and rejecting it because plan at issue was too general to be protectable).  Here, however, Danielson did nothing whatsoever at trial to show how the misattribution might have cost it other potential work.  We see no evidence in the record that Danielson even operated outside Massachusetts at this time, in order to establish the necessary interstate commerce nexus for the market in which business was allegedly lost.  Cf. Johnson, 149 F.3d at 502 (record established that plaintiff was licensed in three states and did work in all of them).  Danielson also admitted at trial that, in its diminished capacity in the 1990s, the firm was no longer able to do a job of the type or scale of the Willows at Winchester.  Thus a developer of a similar project who saw

Danielson's logo on the drawings and considered hiring it would have been unable to do so anyway.

Perhaps the meager showings of commerce and harm that Danielson did offer might have been enough to justify nonmonetary relief in a different case. See Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave., 284 F.3d 302, 311 (1st Cir. 2002) (under Lanham Act, "a plaintiff seeking damages must show actual harm to its business"); Web Printing Controls Co. v. Oxy-Dry Corp., 906 F.2d 1202, 1204 (7th Cir. 1990) (reversing dismissal of claim for failure to show harm when injunctive relief was requested). Here, however, Danielson claimed only money damages and failed to carry its burden of proof. On the facts of record in this case we therefore affirm the dismissal of the claim. As a result, we also affirm the denial of attorneys' fees, because Danielson was not the "prevailing party" as required by the statute. 15 U.S.C. § 1117(a).

## IV. Damages

WCP appeals from the jury instructions on damages, while Danielson appeals the district court's reduction of copyright damages and denial of prejudgment interest.

## A. Infringer's Profits

The principal damages in this case, on which the parties focus the most attention, are profits from selling condominium units in the Willows at Winchester. Damages for copyright

infringement include "any profits of the infringer that are attributable to the infringement." 17 U.S.C. § 504(b). The copyright owner needs only to present evidence of the infringer's gross revenues; the burden is then on the defendant to show how much of its revenues are profits, and what "elements of profit [are] attributable to factors other than the copyrighted work." Id.

In this case, stipulations by the parties settled many of these issues. The parties agreed that the gross revenues from the sale of all 70 condominium units totaled $19,867,684. They also stipulated that WCP incurred at least $18,136,667 in deductible expenses. They disagreed about whether an additional amount of up to $386,067 for commissions to real estate brokers was also deductible, a question of fact that was left to the jury and is not directly before us on appeal. Therefore, depending on the outcome of that dispute, the total pool of profits from which the jury could calculate damages was between $1,344,950 and $1,731,017. The jury awarded Danielson $1,464,950. This figure suggests that the jury apportioned, at most, a negligible amount of the profits and awarded all or almost all of WCP's profits to Danielson.[10] WCP

---

[10] If the district court was correct that the jury's copyright damages included $120,000 of actual damages, then it appears that the jury deducted the full amount for real estate commissions and did no apportionment at all.

argues that some apportionment is required by law, and that faulty instructions led the jury not to do the necessary apportionment.

The caselaw is clear on this point: there must be a rational apportionment of profits. The division of profits between those portions attributable to the infringement and those attributable to other sources does not require "mathematical exactness." Abend v. MCA, Inc., 863 F.2d 1465, 1480 (9th Cir. 1988) (apportionment required where film "Rear Window" infringed underlying short story, but also earned profit from reputations and creative contributions of many others, including Grace Kelly, James Stewart, and Alfred Hitchcock). The Supreme Court held in 1940 that a "reasonable approximation" was enough if it allowed "a rational separation of the net profits so that neither party may have what rightfully belongs to the other." Sheldon v. Metro-Goldwyn Pictures Corp., 309 U.S. 390, 404 (1940) (internal quotations omitted) (requiring apportionment where movie infringed parts of play, but added other content, as well as costumes, scenery, and the like).

In Data General, this court found some apportionment required as a matter of law because the defendant showed that, apart from its infringing activity, customers purchased its services for reasons such as the price, quality, and breadth of its service. 36 F.3d at 1174, 1177. We agree with WCP that Data General controls this case. See also Bruce v. Weekly World News,

Inc., 310 F.3d 25, 31-32 (1st Cir. 2002) (50-50 apportionment of profits from sales of T-shirts featuring infringed "generic" photo of President Clinton shaking hands, retouched to depict him greeting an alien); Sygma Photo News, Inc. v. High Soc'y Magazine, Inc., 778 F.2d 89, 96 (2d Cir. 1985) (reducing district court's apportionment of profits for infringing photo of Raquel Welch on cover of "Celebrity Skin" magazine because of failure to account for cover's list of other celebrities pictured inside); Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc., 772 F.2d 505, 518 (9th Cir. 1985) (one percent apportionment for infringing use of songs in Las Vegas revue was clear error because evidence indicated the songs were more important to the revue's success); ABKCO Music, Inc. v. Harrisongs Music, Ltd., 508 F. Supp. 798, 801-02 (S.D.N.Y. 1981) (apportioning song's profits between infringing melody, noninfringing lyrics, and fame and appeal of singer George Harrison).

At trial, WCP presented evidence concerning many contributing factors that helped the Willows at Winchester turn a profit besides Danielson's skeletal site plans. It pointed to five volumes of subsequent and more detailed architectural drawings necessary to complete the project. Other evidence concerned the extensive efforts WCP made to coordinate logistics, supervise subcontractors, choose and install various amenities, market the development, and sell the condominium units. WCP also argued that

aspects of Danielson's site plans, such as the placement of garages and parking areas, actually might have detracted from the development's appeal. WCP supported many of these contentions with testimony from two experts: David Barsky, an architect, and Sue Hawkes, a condominium marketing consultant.[11]

"[T]he defendant may show that the existence and amount of its profits are not the natural and probable consequences of the infringement alone, but are also the result of other factors which either add intrinsic value to the product or have independent promotional value." Data Gen., 36 F.3d at 1175. Where such a showing is made, apportionment is required. Id. at 1177; Cream Records, Inc. v. Jos. Schlitz Brewing Co., 754 F.2d 826, 828 (9th Cir. 1985) ("[W]here it is clear . . . that not all of the profits are attributable to the infringing material, the copyright owner is

_____

[11]   On appeal, Danielson challenges the district court's decision to allow these experts to testify at trial. We review for abuse of discretion. See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999). We find no such abuse; Barsky and Hawkes are both experienced professionals with relevant expertise. Meanwhile, WCP appeals the district court's decision to exclude certain parts of the testimony it wanted to elicit from Hawkes, especially her estimate that the contribution of a site plan to a condominium project is no more than 10-15 percent of its total appeal. Given the lack of foundation offered for this particular number, we think the district court was within its discretion to limit Hawkes's testimony in this manner. At a second trial, if one is required, see infra Part IV.C, WCP might do a better job of establishing the basis for this opinion, or might offer other experts or evidence to support it. More importantly, when the jury is given the proper standard rather than instructed to look for mathematical exactness, it will be less important for WCP to produce a precise numerical figure.

not entitled to recover all of those profits merely because the infringer fails to establish with certainty the portion attributable to the non-infringing elements."); Orgel v. Clark Boardman Co., 301 F.2d 119, 121 (2d Cir. 1962) ("[W]here an infringer's profits are not entirely due to the infringement, and the evidence suggests some division which may rationally be used as a springboard it is the duty of the court to make some apportionment."). Many of the noninfringing elements that triggered apportionment in the cases we have cited here -- such as the popularity of a celebrity, the quality of a finished product, or marketing efforts -- were inchoate. We hold that WCP has likewise made enough of a showing to require some apportionment as a matter of law. See Data Gen., 36 F.3d at 1177.

WCP argues that the district court's instructions to the jury foreordained its refusal to apportion, because they erroneously stated an extremely high standard to show that an element of profit was not attributable to the infringement. We overturn a jury instruction only if it prejudices a party's substantial rights because it misleads the jury or misstates or unduly complicates the correct legal standard. See Faigin v. Kelly, 184 F.3d 67, 87 (1st Cir. 1999). The instructions on apportionment did all three.

WCP proposed jury instructions that reflected the precedents reasonably accurately. Parties are entitled to jury

instructions that reflect the correct legal standards, but not, of course, the exact phrasing they desire. See Luson Int'l Distribs., Inc. v. Fabricating & Prod. Mach., Inc., 966 F.2d 9, 13 (1st Cir. 1992). Here, however, the district court's instructions on apportionment were misleading and inconsistent with the applicable law:

> [WCP argues it is] entitled to apportion those net revenues, and if there are portions of those revenues which were earned completely free of what the site plan drawings which were infringed were used for, then they shouldn't have to pay those net revenues over to Danielson. . . . [This portion] had nothing to do with the infringement.
>      Well, they say that. The [WCP] folks have to prove that, and again by a fair preponderance of the evidence. So you consider things. Were the design features wholly separate from the site plan drawings[?] Was there a marketing plan wholly separate[?] You consider those aspects, but they have to be wholly separate.

WCP objected at the end of the instructions: "[W]hen you defined the burden on apportionment of damages, twice you used the phrase that the apportionment has to be 'wholly separate,' 'completely free.' . . . That's an overstatement of what we have to show in the case." We could put it no better ourselves. These instructions required mathematical exactness and complete separability to allow apportionment, but the law imposes no such requirements. In objecting, WCP also referred the court to several cases that supported its position and were contrary to the instructions, including ABKCO Music and Sygma News. The trial judge interrupted, saying "I'm satisfied with the charge."

-47-

The jury, apparently, was less satisfied. After several hours of deliberation, it sent a note to the judge asking for clarification:

> Trying to understand apportionment. Author writes story. Movie studio infringes story and turns it into a movie. Movie makes a hundred million profit. Obviously there were many added aspects to make movie. Does author recover a hundred million since story underlies the whole [movie]? There is [sic] clear creative contributions by many others. Can this have an impact on the award? We need more understanding of the law of apportionment with respect to copyright infringement.

The court responded with a further charge that largely reiterated its prior one:

> In order to prove apportionment [WCP] has to prove by a fair preponderance of the evidence that some aspect or aspects of the net revenues are the result of something other than the copyright infringement. If it's all intertwined and there can be no separately identifiable amount, and to give your example, the authors, the book authors underlies [sic] the entire movie, then there's no apportionment. But if there is a portion of those net revenues, net profits, which are apart from, separate from, identifiably separate from the copyright infringement, and [WCP] has proved that by a fair preponderance of the evidence, then it's only fair that that be apportioned out because that part of it was not permitted, was not enhanced or allowed or undergirded by the copyright infringement. . . . If you are going to apportion you see if [WCP] has identified a separable amount, and then you deduct that amount or that portion and the Danielson folks get the remainder.

The judge's response to the jury's hypothetical was inconsistent with two leading cases presenting similar facts, Sheldon, 309 U.S. at 404, and Abend, 863 F.2d at 1478-80. Otherwise, the second charge merely echoed the court's original

-48-

error, albeit without some of the intensifying adverbs, and it did nothing to undo the damage.[12]  WCP did not need to prove that its noninfringing contributions to the development were "wholly separate" from Danielson's plans, as the first instruction repeatedly said.  It is also wrong to state, as did the second instruction, that apportionment is unavailable where the final product was "enhanced or allowed or undergirded by the copyright infringement."[13]

In light of these erroneous instructions on apportionment, we must vacate the copyright damages.[14]  See Data Gen., 36 F.3d at 1177 (citing Allen v. Chance Mfg. Co., 873 F.2d

---

[12]  Danielson argues that WCP waived this issue by failing to object again to the reiterated instruction.  Given that WCP offered an instruction on apportionment, objected to the original charge, and raised this issue again in its post-verdict motion for a new trial, we will consider it preserved for appeal.  Even if there were waiver, it would simply limit our review to clear error, and that standard would be satisfied here.

[13]  We are unpersuaded by Danielson's argument that apportionment is not appropriate because the entire development was "intertwined" with the infringed site plans.  Danielson cites only one case to us in support of this notion, Business Trends Analysts, Inc. v. Freedonia Group, 700 F. Supp. 1213, 1241 (S.D.N.Y. 1988), aff'd 887 F.2d 399 (2d Cir. 1989).  That case is simply inapplicable: the court there found the record "absolutely bereft of any proof" from defendants on apportionment.  Id.  Its reference to intertwining referred to the lack of any evidence that would "sensibly and responsibly extricate the gold from the dross."  Id. In contrast, the evidence in the case before us allows a sensible and responsible apportionment.

[14]  This finding obviates the need for us to consider separately WCP's appeal of the denial of its motion for a new trial, which was predicated on damages issues; our holding has the same effect.

465, 470 (1st Cir. 1989)). Apportionment is "ultimately a delicate exercise informed by considerations of fairness and public policy, as well as fact." Data Gen., 36 F.3d at 1176. The instructions here did not fulfill these goals, and the jury's verdict was distorted as a result.

B. Other Damages Issues

In addition to profits based on the infringement, Danielson is also entitled to any actual damages it suffered. 17 U.S.C. § 504(b). If, for example, Danielson demonstrated the amount of compensation that it might have obtained from WCP, but had lost because WCP unlawfully copied the drawings instead, that sum would serve as a good measure of actual damages. The district court determined that the jury had added $120,000 to its award of copyright damages and that this amount was overly speculative, and so the court reduced the award commensurately. Danielson appeals this decision. We are concerned that the court's response may itself have depended on speculation, but by vacating the damages award we have eliminated the need to decide this question. We also vacate the district court's alternative order of remittur. Danielson may offer evidence to show actual damages in any further proceedings to calculate damages.

Finally, Danielson appeals the district court's denial of prejudgment interest. We review this decision for abuse of discretion. Hogan v. Bangor & Aroostook R.R., 61 F.3d 1034, 1038

(1st Cir. 1995). In ruling from the bench, the district court stated that it relied on <u>Murray</u> v. <u>Shaw Industries, Inc.</u>, 990 F. Supp. 46 (D. Mass. 1997). That case found that prejudgment interest was inappropriate where the entire damages award was composed of disgorged profits from an infringer, because, unlike actual damages, the plaintiff never had those funds and so deserved no compensation for the lost use of the money while the case was pending. <u>Id.</u> at 48. This reasoning is sound and not an abuse of discretion. Danielson offers no support for its assertion that the standards for awarding prejudgment interest and attorneys' fees are the same, and we find none. We do note, however, that after further proceedings Danielson's award may include some actual damages. If so, the district court may, in its discretion, choose to revisit this issue.

C. <u>Remand</u>

We hope that damages can now be resolved without requiring the empanelment of another jury for a new proceeding. As we did in <u>Data General</u>, 36 F.3d at 1177 n.52, we offer some thoughts to assist the district court in the conduct of further proceedings. First and foremost, now that WCP's liability is established and every underlying legal issue is resolved, we urge the parties to renew their efforts to settle the case. Alternatively, the parties could agree to allow the district court to determine damages on the basis of the evidence already presented

at trial.  See 4 Nimmer, supra, § 14.03(D), at 14-41 (parties may consent to bench trial).  The district court might also accept some further briefing or evidence before ruling on damages.  Finally, if the parties decline all of these invitations, we encourage the district court to consider, in its discretion, ordering a remittitur.  Data Gen., 36 F.3d at 1177 n.52.  Fifteen years have passed since the drawings at the center of this case were produced.  There is no advantage to prolonging the litigation any further.

## V.  Conclusion

For the reasons stated in this opinion, the district court's decisions dismissing WCP's affirmative defenses and Danielson's unfair competition claims are **affirmed**.  The damages award is **vacated** and the case is **remanded** for proceedings to calculate damages consistent with this opinion.